# 21-4541

# United States Court of Appeals
### *for the*
# Fourth Circuit

UNITED STATES OF AMERICA,

*Plaintiff/Appellee,*

— v. —

CLIFTON MOSLEY,

*Defendant/Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND AT BALTIMORE

# BRIEF OF APPELLANT

Richard S. Stolker
LAW OFFICES OF RICHARD S. STOLKER
12154 Darnestown Road, Suite 433
Gaithersburg, Maryland 20878
(301) 294-9500

*Counsel for Appellant*


COUNSEL PRESS     (800) 4-APPEAL • (JOB 811363)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................... iii

JURISDICTIONAL STATEMENT ...................................................................................... 1

STATEMENT OF THE ISSUES ........................................................................................... 1

STATEMENT OF THE CASE ............................................................................................... 2

STATEMENT OF FACTS ...................................................................................................... 4

SUMMARY OF ARGUMENT .............................................................................................. 24

ARGUMENT ............................................................................................................................ 25

    I      THE DISTRICT COURT ABUSED ITS DISCRETION BY
            DECLINING TO SEVER THE HOMICIDE-RELATED
            CHARGES FROM THE MARIJUANA CHARGES ........................ 25

            A.     Applicable Law ........................................................................ 25

            B.     Standard of Review ................................................................. 26

            C.     Argument .................................................................................. 27

    II     THE DISTRICT COURT ERRED IN REFUSING TO
            SUPPRESS EVIDENCE OBTAINED IN VIOLATION OF
            THE DEFENDANTS' FOURTH AMENDMENT RIGHTS ............. 30

            A.     Applicable Law ........................................................................ 30

            B.     Standard of Review ................................................................. 30

            C.     Argument .................................................................................. 30

                1.     Baltimore City Police Lacked Reasonable
                       Suspicion to Conduct a *Terry* Stop of the BMW ........... 32

                2.     Baltimore City Police Officers Who Stopped and
                       Detained Carter Were Unlawfully Acting
                       Outside of Their Jurisdiction ......................................... 37

III    THE EVIDENCE AGAINST APPELLANT WAS INSUFFICIENT AS A MATTER OF LAW TO SUSTAIN HIS CONVICTIONS ........................................................40

    A.    Applicable Law ........................................................40

    B.    Standard of Review ................................................40

    C.    Argument ................................................................41

CONCLUSION ........................................................46

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

Alderman v. Baltimore City Police Department,
   952 F. Supp. 256 (D. Md. 1997) ...........................................................37

Burks v. United States,
   437 U.S. 1 (1978) ..................................................................................46

Florida v. Bostick,
   501 U.S. 429 (1991) ..............................................................................36

Glasser v. United States,
   315 U.S. 60 (1942) ................................................................................40

Illinois v. Wardlow,
   528 U.S. 119 (2000) ..............................................................................33

Jackson v. Virginia,
   443 U.S. 307 (1979) ................................................................................4

Johnson v. Baltimore Police Department,
   452 F. Supp. 3d 283 (D. Md. 2020) .....................................................37

King v. United States,
   355 F.2d 700 (1st Cir. 1966) ................................................................25

Musacchio v. United States,
   136 S. Ct. 709 (2016) ...........................................................................41

Ornelas v. United States,
   517 U.S. 690 (1996) ..............................................................................33

Taylor v. Alabama,
   457 U.S. 687 (1982) ..............................................................................37

Terry v. Ohio,
   392 U.S. 1 (1968) ........................................................................ *passim*

United States v. Alerre,
   430 F.3d 681 (4th Cir. 2015) ................................................................40

United States v. Block,
   590 F.2d 535 (4th Cir. 1978) ................................................................46

United States v. Burgos,
   94 F.3d 849 (4th Cir. 1996)........................................................... 40, 45

United States v. Calandra,
   414 U.S. 338 (1974)...........................................................................30

United States v. Cardwell,
   433 F.3d 378 (4th Cir. 2005)........................................................ 26, 29

United States v. Clarke,
   842 F.3d 288 (4th Cir. 2016)............................................................41

United States v. Cortez,
   449 U.S. 411 (1981).................................................................... 32, 33

United States v. Gardner,
   823 F.3d 793 (4th Cir. 2016)............................................................32

United States v. Green,
   599 F.3d 360 (4th Cir. 2010)............................................................40

United States v. Hawkins,
   776 F.3d 200 (4th Cir. 2015)................................................. 26, 28, 29

United States v. Hensley,
   469 U.S. 221 (1985)................................................................ 34, 35, 36

United States v. Hirschfeld,
   964 F.2d 318 (4th Cir. 1992)............................................................27

United States v. Lane,
   474 U.S. 438 (1986).........................................................................26

United States v. Mackins,
   315 F.3d 399 (4th Cir. 2003)............................................................26

United States v. Montgomery,
   262 F.3d 233 (4th Cir. 2000)............................................................26

United States v. Murillo,
   826 F.3d 152 (4th Cir. 2016), cert. denied, 137 S. Ct. 812 (2017) .....................30

United States v. Oaks,
   285 F. Supp. 3d 876 (D. Md. 2018) ...................................................29

iv

United States v. Oscar-Torres,
   507 F.3d 224 (4th Cir. 2007) ...............................................37

United States v. Perkins,
   363 F.3d 317 (4th Cir. 2004) ...............................................34

United States v. Quarles,
   330 F.3d 650 (4th Cir. 2003) ..............................34, 35, 36

United States v. Rodriguez-Soriano,
   931 F.3d 281 (4th Cir. 2019) ...............................................40

United States v. Santoni,
   585 F.2d 667 (4th Cir. 1978) ...............................................25

United States v. Savage,
   885 F.3d 212 (4th Cir. 2018) ...............................................41

United States v. United Medical & Surgical Supply Corp.,
   989 F.2d 1390 (4th Cir. 1993) ...............................................4

United States v. Werner,
   620 F.2d 922 (2d Cir. 1980) ...............................................26

United States v. Whitehead,
   539 F.2d 1023 (4th Cir. 1976) .............................................25

United States v. Young,
   609 F.3d 348 (4th Cir. 2010) ...............................................40

Whren v. United States,
   517 U.S. 806 (1996) ...........................................................32

Wong Sun v. United States,
   371 U.S. 471 (1963) ...........................................................37

**Statutes and Other Authorites:**

U.S. Const. amend. IV ................................................. *passim*

18 U.S.C. § 2 ...........................................................................3

18 U.S.C. § 922(g) ..................................................................2

18 U.S.C. § 1512(a)(1)(a) ...................................................2, 3

18 U.S.C. § 1512(k) .............................................................2, 3

18 U.S.C. § 1513(a)(1)(A) ....................................................................3

18 U.S.C. § 1513(a)(1)(b) ....................................................................2

18 U.S.C. § 1513(a)(1)(B) .................................................................2, 3

18 U.S.C. § 1513(f) ..............................................................................2

18 U.S.C. § 3231 ..................................................................................1

21 U.S.C. § 841 ....................................................................................2

21 U.S.C. § 841(a)(1) ..........................................................................3

21 U.S.C. § 841(b)(1)(D) ....................................................................3

28 U.S.C. § 1291 ..................................................................................1

28 U.S.C. § 1294(1) .............................................................................1

Fed. R. Crim. P. 8 ..............................................................................26

Fed. R. Crim. P. 8(a) ............................................................. 26, 27, 29

Fed. R. Crim. P. 8(b) .........................................................................25

Fed. R. Crim. P. 14(a) ................................................................. 26, 29

Fed. R. Crim. P. 33 ..............................................................................3

Md. Code Ann., Local Gov't § 1-101(e) ............................................37

Md. Stat. Ann., Criminal Procedure § 2-101 ....................................39

Md. Stat. Ann., Criminal Procedure § 2-102 ............................... 37, 38

1A Charles Alan Wright, *Federal Practice and Procedure* § 143
    (3d ed. 1999) ................................................................................27

# JURISDICTIONAL STATEMENT

Jurisdiction for this appeal arises from a final Judgment in a Criminal Case of the United States District Court for the District of Maryland that was entered on September 23, 2021, pursuant to appellant's conviction on multiple counts of a superseding indictment (JA1972).[1] The District Court had jurisdiction over these criminal proceedings pursuant to 18 U.S.C. § 3231. An appeal from the Judgment in a Criminal Case was filed on September 23, 2021 (JA1978). This Court has jurisdiction over this appeal from the final decision of the District Court pursuant to 28 U.S.C. §§ 1291 and 1294(1).

# STATEMENT OF THE ISSUES

1.      Whether the District Court abused its discretion by declining to sever the homicide-related charges from the marijuana charges, to appellant's prejudice.

2.      Whether the district court erred in refusing to suppress evidence obtained in violation of the defendants' Fourth Amendment right to be free of unreasonable searches and seizures.

---

[1]      Joint Appendix ("JA").

3. Whether the Baltimore City Police lacked reasonable suspicion to conduct a *Terry* stop of Davon Carter, from whom it seized evidence that was used against appellant at trial.

4. Whether Baltimore City Police officers who stopped and detained Davon Carter in Baltimore County were acting outside their lawful jurisdiction.

5. Whether the evidence against appellant was insufficient as a matter of law to sustain his convictions.

## STATEMENT OF THE CASE

In December 2017 a federal grand jury returned an indictment charging Devon Carter with conspiracy to murder a witness (retaliation), in violation of 18 U.S.C. § 1513(f); witness retaliation murder, in violation of 18 U.S.C. § 1513(a)(1)(b); conspiracy to murder a witness (tampering), in violation of 18 U.S.C. § 1512(k); witness tampering murder, in violation of 18 U.S.C. § 1512(a)(1)(a); felon in possession of ammunition, in violation of 18 U.S.C. § 922(g); and possession with intent to distribute marijuana, in violation of 21 U.S.C. § 841. A superseding indictment returned in January 2019 added drug trafficking charges.

A second superseding indictment returned in March 2019 (JA26) added appellant Clifton Mosley as a codefendant, charging him with conspiracy to murder a witness in retaliation, in violation of 18 U.S.C. §§ 1513(f) and 1513(a)(1)(B);

witness retaliation murder (aiding and abetting), in violation of 18 U.S.C. §§ 2 and 1513(a)(1)(B); conspiracy to murder and witness tampering, in violation of 18 U.S.C. §§ 1512(k) and 1512(a)(1)(A); witness tampering murder (aiding and abetting), in violation of 18 U.S.C. §§ 2 and 1513(a)(1)(A); and distribution of marijuana (aiding and abetting), in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(D), and 18 U.S.C. § 2.

A thirteen day jury trial was held in Baltimore before the Honorable George J. Hazel. The government presented the testimony of 39 witnesses and hundreds of exhibits. At the conclusion of the government's case, the defense moved for judgment of acquittal, which the court denied. The defense did not put on a case.

Appellant Mosley was convicted and subsequently was sentenced to 60 months for distribution of marijuana and life in prison as to each of the remaining counts, all counts to run concurrently (JA1972). Codefendant Carter also was convicted and sentenced to life imprisonment. He filed an appeal but later voluntarily dismissed the appeal before briefing (JA25).

After his conviction, appellant filed a Motion for New Trial pursuant to Fed. R. Crim. Proc. 33, on the ground of newly discovered evidence. That evidence consisted of the statement of government witness Kimberly Melvin recanting her trial testimony as the product of mental health issues including excessive drinking and because she

was upset and tired.  The court below conducted a hearing on the motion for new trial

and made detailed findings as to Melvin's testimony, concluding as follows:

> The Court is not reasonably well satisfied that the testimony given by a
> material witness is false. If anything, I am more than satisfied, having
> observed Ms. Melvin twice, that the testimony given today was false. I
> am well satisfied that her recantation is false. I am not reasonably well
> satisfied that the testimony she gave at trial was false. And so for that
> reason alone, I deny the motion for new trial.  (JA1971)

This appeal followed (JA1978).

# STATEMENT OF FACTS

Viewing the evidence in the light most favorable to the government, Jackson

v. Virginia, 443 U.S. 307, 319 (1979), United States v. United Medical & Surgical

Supply Corp., 989 F.2d 1390, 1402 (4th Cir. 1993), the following was established at

trial.

Lisa Edmonds, formerly employed by RX Resources and Solutions (RXRS),

a durable medical equipment company, contacted a whistleblower hotline of the

Department of Health and Human Services (HHS) in September 2013 with concerns

that a fraud scheme was being perpetrated at RXRS involving delivery tickets and

patient complaints.  She met with HHS agents in November 2013 and discussed the

role of Matthew Hightower, a delivery driver for RXRS and a purported participant

in the fraudulent scheme (JA426-469).   Following an investigation, a federal grand

jury in the District of Maryland returned an indictment on June 3, 2015 charging Matthew Hightower with conspiracy to commit health care fraud, extortion, theft and related offenses (case no. 1:15-cr-00322) (JA2011).

As part of discovery in the health care fraud case, the Government disclosed Edmonds' name to all counsel. On July 2, 2015, the Government produced a memorandum of interview containing information Edmonds had regarding health care fraud and threats Hightower made against David Wutoh for money owed to Hightower. The government did not introduce any threatening calls from Hightower to Edmonds. It did introduce a text message, dated July 25, 2015, in which Hightower wrote: "Wassup Lisa this is Matt I have a question for you about our old job call me @ 44349832513 when you get this. Thanks!" (JA436-437, JA2284). In the case at bar the government contended that disclosure of the confidential informant's identity may have inspired Hightower to seek to eliminate her as a witness against him.[2]

Latrina Ashburne was Edmonds' next-door neighbor. Ashburne was a teacher's assistant and worked with her pastor at a local church. The front doors to their

---

[2]     Hightower's codefendant, Elma Myles, testified that late summer of 2015, she and Hightower had meetings with respective attorneys located in the same building. Hightower told Myles that he believed Lisa Edmonds was the cooperating witness, and related specific information from the Edmonds memorandum (JA994-1007).

respective residences were a few feet apart and shared a common sidewalk. On May 27, 2016 Ashburne was shot and killed in front of her home on Rosalind Avenue in Baltimore City. (Besides the proximity of their residences, Ms. Ashburne somewhat resembled Edmonds, the presumed victim.)[3]

The sole witness to the shooting, Aquanna Murray, testified that she was driving home from her child's school when she saw a man chasing and shooting after Latrina Ashburne. She heard one gunshot, saw Ashburne collapse, and saw the shooter run off. The incident occurred very quickly and she did not actually see the gun or the shooting, just the smoke and the sound. She was able to describe the shooter only as a tall man who ran into the woods. Murray did not identify Carter or Mosley in court or in any photo array (JA75-106).

Baltimore City Police Officer Aaron Cain was the first responder to the shooting scene. After identifying photographs, a street map and a surveillance video, he described the victim's condition, and explained the CAD report shooing the time of the call and the dispatcher's notes (JA107-127).

Travis Winder, a crime laboratory supervisor for the Baltimore Police Department, arrived at the scene and was briefed by Officer Cain. He photographed the

---

[3]    Edmonds testified at trial that the shooting may have been intended for her, since she previously had driven a similar car and was afraid that Hightower may have been targeting her.

scene, including the victim's car that was parked in front of her house, suspected bloodstains on the curb, and a set of keys found near a tree. He dusted the driver's side of the car for latent fingerprints but did not recover anything usable. He did not find any firearms evidence, hair samples or fingerprints at the scene, nor did he speak with any witnesses nor conduct any further analysis on the evidence he had collected (JA128-144).

Christopher Iber testified as a forensic examiner of questioned photographic evidence for the FBI. Despite applying his experience and methodology, he was unable to determine the height of the person of interest nor identify the vehicles of interest with individualized characteristics (JA187-191).

Detective Lee Robert Brandt, Jr., a 13 year veteran of the Baltimore City Police Department, described his experience and training in digital image and video retrieval. He recovered video from the surveillance system of the Sinai Ridge Apartments, where the shooting of Latrina Ashburne had occurred. He identified videos taken from around the apartment complex and explained a two minute difference between real time and the time displayed on the videos (JA194-215).

Surveillance video from the area showed the shooter fleeing on foot and passing through a nearby parking lot where a 2005 Pontiac Grand Am apparently was waiting to pick up the shooter, under the government's theory of the case. The Pontiac was

owned by the mother of Carter's girlfriend, purported establishing a connection with Hightower because Carter and Hightower knew each other and sometimes sold marijuana together (JA228-285). Hightower also owned a silver Audi that was in the vicinity before and after the Ashburne murder (JA330-332).

On June 1, 2016 Baltimore City Police Detective Troy Taylor, after receiving a call from another detective (Forsythe) that a potential suspect in a homicide case had just exited a residence and gotten into a black BMW truck. Taylor stopped and detained Carter. When Carter opened the driver side door, Taylor smelled "a very strong odor of unburnt marijuana illuminating [*sic*] from the vehicle (JA500).[4] Taylor recovered marijuana and cash from Carter's vehicle and transported him to a police station for questioning. On cross-examination Taylor conceded he did not have probable cause to arrest Carter for the murder (JA508-509). Despite testifying on direct examination that he had opened the trunk and saw a duffel bag containing marijuana, paraphernalia and money, on cross-examination he denied searching the vehicle (JA502, JA511).

Homicide Detective Sergeant Sean Jones responded to the scene of the Latrina Ashburne shooting, where he identified the direction of flight and the surveillance

---

[4]    The parties stipulated that the substance recovered from Carter's vehicle was marijuana (JA514).

cameras in the vicinity. He obtained video footage showing a suspect in a vehicle of interest. He learned from other agencies that Ms. Ashburne may have been mistakenly identified and that the intended target likely was her neighbor, who had been involved in an ongoing federal investigation (JA518-520).

After Carter had been stopped and arrested on June 1, 2016, Jones interviewed Carter's girlfriend Deanna Lawson and her mother Antoinette King, who owned the subject vehicle. He obtained a search warrant and searched the vehicle for possible evidence. Carter was placed under arrest for marijuana but was released when the prosecution declined to charge him (JA524-539).

Detective Jones participated in the search of the Pontiac Grand Am that Carter had ben driving when stopped by Baltimore County police. He found $930 in cash in the glove compartment, which was returned to Carter. An inspection of the tires and brakes showed that the brakes had not been recently repaired as Carter had claimed (JA539-540, JA555-558). No firearms or other evidence related to the homicide was found in the vehicle. Jones also participated in a search of an Audi S6 registered to Michael Fleming, that had been seen on surveillance video near the murder scene. After the Audi was found at a repair shop, he compared the license plate on the Audi to the license plate found on the BMW that Hightower was driving. Both had the same tag number. Fingerprints and palm prints found in the Audi

matched Carter's and Hightower's, but none matched Fleming's or Mosley's (JA540-551).

Michael Bailey, a mechanic who knew Davon Carter and Matthew Hightower, testified that he had a discussion about repairing the brakes on Carter's vehicles on May 27, 2016, but did not actually perform the repairs at that time. He did repair the brakes on a Pontiac. Although he and Carter discussed doing some brake work on his vehicle in exchange for marijuana, the work was not done on Carter's vehicle on the date that had been arranged. Bailey saw Carter driving an Audi on May 29, 2016 (JA560-583).

Following hearings on May 4- 6, 2016, the Court detained Hightower pending trial. Carter spoke with Hightower on May 4, 2016. They discussed Edmonds and the case on recorded jail calls. Clarence Sampson testified that Carter told him "Matt had got some time" and that "somebody was telling on [Matt] and he had to handle it."

The government offered extensive cell phone location exhibits and testimony to establish the whereabouts of the various parties at the time of the shooting and its aftermath.

FBI Special Agent Matthew Wilde was qualified as an expert in cellular phone record and cell site analysis. Using his training and expertise, Wilde presented his findings on the cell site locations of various phone numbers associated with Michael

Bailey, Clifton Mosley, Davon Carter and Matthew Hightower, particularly locations in May 2016. Wilde explained how call detail records are obtained from phone carriers and the information they contain, such as date, time duration and cell tower and sector information. Google Maps or similar software is used to pinpoint the cell tower locations and sector information (JA601-628).

Wilde extracted contact information and other data from two cell phones belonging to Carter, with phone numbers ending in 5150 and 7626. After explaining the methods used to prepare his reports and PowerPoint presentation, he testified about how he was able to connect cell phone data with appellant as well as Bailey, Carter and Hightower on May 2 and May 27, 2016, the dates most relevant to the instant case (JA628-757).

During an autopsy of Ashburme, the medical examiner recovered a jacketed bullet from Ashburne's lung. A firearms expert testified that the bullet was consistent with a Remington golden saber bullet that had been fired from a Ruger semiautomatic weapon. No such weapon was ever recovered (JA1409-1422, JA1665-1670). No other forensic evidence, such as DNA or fingerprints, linked either Carter or Mosley to the shooting.

The shooting itself was not recorded on any surveillance camera, but numerous cameras located in the neighborhood captured some portions of the events on the

morning of the murder. One camera yielded grainy footage of a person walking quickly through the area. The government contended that the person on the video resembled Carter, but no witness positively identified him as Carter. The government theorized that the man on the video ran as if he had been injured, and played a May 23, 2016 jail call with Hightower in which Carter said that had fallen and injured his right wrist.

A video camera photographed a 2005 Pontiac Grand Am registered to Antoinette King, the mother of Carter's girlfriend, Deanna Lawson. Another camera captured a silver Audi with a distinctive long, narrow European-style front license plate; Hightower owned such an Audi. The Audi was in the area near the scene of the murder between approximately 6:14 and 6:17 a.m. and between approximately 7:24 and 7:55 a.m. (JA283-284, JA292, JA546, JA578-580, JA829). No witness identified the driver of the either the Pontiac or the Audi.

Antoinette King confirmed that she was a registered owner of a Pontiac Grand Am that had been used by Lawson and Carter. She knew Carter as her daughter's boyfriend but had little or no knowledge of his activities and employment (JA292-294).

Cell Site Location Information ("CSLI") placed phones associated with Mosley and Carter within the part of Baltimore City that included the murder scene on the day

of the shooting and its aftermath. The CSLI placed the phone associated with Mosley in that area of Baltimore City where the Audi was first captured in the video, when the murder happened, and directly after. Surveillance video captured the Audi proceeding on Rosalind Avenue before the shooting and on Rosalind Avenue a few minutes later. Mosley admitted having driven the Audi (JA648-682, JA798-800, JA1685-1715).

Immediately after the shooting, Edmonds called a federal agent involved in the Hightower case, HHS Special Agent Erin Fuchs, to report her belief that she was the intended victim. Baltimore Police Department ("BPD") traced the Pontiac to the mother of Carter's girlfriend, Deanna Lawson. For his part, Carter left Baltimore in the Audi on a pre-planned trip to "bike week" in Myrtle Beach, South Carolina. CSLI information for another phone associated with Carter showed that he drove through the Washington, D.C. area around 12:20 p.m. Hotel records documented Carter's stay in Myrtle Beach. The government presented evidence that – in connection with a trip to the beach on the unofficial first weekend of summer – Carter had shaved the beard that he had prior to the trip (JA383-384, JA596).

Andre Farrell, a friend of Davon Carter, traveled to Myrtle Beach, South Carolina in May 2016, where he met up with Carter at the Captains Quarters hotel and borrowed some money from him. He returned home from Myrtle Beach on May 30, 2016 but not with Carter (JA894-903).

The government presented evidence that on the morning of the murder, Mosley had ignored cell phone communications from his girlfriend, Kimberly Melvin, who had called and texted him repeatedly on both of his phones beginning at 7:20 a.m. and continuing through 7:47 a.m. Mosley did not return Melvin's calls until 8:24 a.m. Melvin testified that Mosley left unusually early that morning when she got in the shower to get ready for work. He told her he was going to pick up his child and take her to school. The government presented cell site evidence and testimony to refute that statement.

When Melvin pressed Mosley further that night as to why he did not answer his phone, Mosley commented that Hightower was in trouble because he had his phone on at the wrong time. Melvin also testified that the night before the murder, Mosley had asked her how to do an online search of the Maryland state court system. Edmonds testified that she had a court hearing scheduled for the morning of May 27, 2016, as confirmed by Maryland Judiciary Case Search (JA1176-1196). No witness testified that Melvin or Mosley conducted a search specifically related to Edmonds.

The government claimed that during an interview with investigators in December 2016, Mosley downplayed his contacts with Carter in May 2016. Mosley did not tell investigators that he had left home on the morning of the murder to pick up his child and take her to school. Instead, he stated that he sold had marijuana and

was likely going to "hustle" that morning. Mosley conceded being acquainted with Hightower.

On May 16, 2016 Baltimore County Police Officer Terry Norris initiated a traffic stop of a silver Audi sedan for speeding in Pikesville, Maryland. The driver, Davon Carter, did not have his driver license with him. He was issued a citation for not having a license and for missing a front license tag on the vehicle, as well as a warning ticket for speeding (JA827-829).

Deshawn Walters, a childhood friend of Davon Carter, was a customer of Davon Carter's marijuana business. He did not know from whom Carter purchased marijuana. Walters identified Carter in open Court (JA833-835).

Sheldon Grant had a marijuana business relationship with Matthew Hightower, whom he supplied with several pounds of marijuana every few weeks. He owned two cellular phones so that he could communicate with Hightower in relative security. At the time Hightower was incarcerated on May 4, 2016 he owed Grant about $15,000. Grant received a phone call from Carter (using Hightower's phone) to announce that he was now in charge. Grant tried to collect the $15,000 from Carter. He drove from New York to Baltimore to meet Carter, but Carter failed to show up or to respond to text messages. He never received the money and eventually gave up trying (JA836-860).

Elma Myles, a former employee of RX Resources and Solutions, a medical equipment firm, was serving a prison sentence for health care fraud and identity theft. She and her former employer billed for supplies and equipment that the customers did not received, amounting to over one million dollars. She had pled guilty as part of a plea deal in which she was to provide information relating to conversations between Hightower and Wutoh, who had been murdered. Excerpts of those conversations were played in open Court (JA1006-1015).

In 2017 Clarence Sampson, a heroin addict and long time friend of Davon Carter, testified that Carter arranged to meet him to "take care of something" involving Matthew Hightower but Carter did not tell him what the "something" was (JA1028-1030). A defense motion to strike Sampson's testimony as lacking relevance was denied (JA1037-1050).

Former RXRS employee Belinda Turner testified about her relationship with Lisa Edmonds, Elma Myles and Harry Crawford, all of whom had been charged with health care fraud. Turner was a documentation coordinator at RXRS, responsible for preparing documents relating to medical equipment shipments to patients. Myles and Crawford were the owners of RXRS; Lisa Edmonds was her supervisor. Hightower was a delivery driver. Turner denied knowing Davon Carter. She denied direct knowledge of the fraudulent scheme and the extortion murder plot that the defendants

were accused of. She testified that RXRS former employee Lisa Edmonds was the source of frustration and suspicion for Hightower and others, who believed that she was lying and providing incriminating information to the authorities (JA1063-1076).

Detective Sekou Hinton testified that he had been investigating the murders of David Wutoh and Amy Ashburne allegedly committed by Matthew Hightower and others. He identified recorded conversations between Davon Carter and Hightower including the voices of the defendants and other participants in the conversations, as well as the searches of vehicles and other locations related to the conversations (JA912-956).

Baltimore Police Detective Ryan Massey was involved in the investigation of the extortion and murder of David Wutoh purportedly committed by Hightower and Carter. He interviewed appellant Mosley, a friend of Hightower's, who had a vehicle and phone records relevant to the case. Mosley admitted selling marijuana but denied selling any other drugs or being involved in the murder. Mosley voluntarily came to othe police department's homicide office and consented to the search of his phones and provided a password for one of the phones that was locked (JA1120-1125).

Erica Blanding-Harris, mother of appellant Mosley's daughter Asia, testified that she had met appellant when she was 14 and dated him on and off until 2008. They had a daughter (Asia) in 2007, whom appellant helped support financially and

sometimes took her to school. To her knowledge appellant worked on homes and as a consultant for an electric company. She identified telephone numbers for Mosley (JA1132-1143).

Kimberly Melvin, appellant's former girlfriend, testified that in 2016 she and appellant were living together. She understood that appellant was supporting himself by selling marijuana but never saw him distribute marijuana. She knew that appellant drove several vehicles including a white Lexus, a silver Lincoln and a gray Audi that was borrowed from Matthew Hightower (known to her as "Fats") (JA1216-1254).

Norman Powell, cousin of appellant Mosley, testified that in 2016 he was in touch by telephone with Mosley, who used a telephone number ending in 2650 (JA1282-1284).

Shayne Bird, owner of Drive Towing, a towing company, testified that he met Matthew Hightower while both were incarcerated in 2015, and continued to have a relationship with Hightower after Bird was released from prison. He was also a friend of appellant Mosley. Prior to his incarceration Hightower had worked as a delivery driver for a medical equipment company. He was asked to tow a black Audi and keep it in his lot. Bird's conversations with Carter and Mosley were admitted over defense objections regarding Hightower's state of mind as well as statements in furtherance of a conspiracy (JA1299-1322).

Arrielle Lee was in a relationship with Davon Carter in 2015 and became pregnant with his child, who was born in July 2017. Upon reviewing a video clip of a man running, she was not sure whether it was Carter nor whether he had a gun (JA1342-1347).

Kareem Anthony, who also goes by the nickname Panama, had known Carter and Hightower for 19-20 years and has known appellant Mosley for "just a few years" (JA1359). He had purchased marijuana from Carter for approximately one month, usually in $20 bags containing approximately one gram of marijuana each. He occasionally received marijuana from Carter for free. Anthony stated that he was employed at the time and was not involved in the sale of marijuana. He sometimes saw Mosley at Hightower's residence and occasionally saw him driving Hightower's silver Audi. Anthony testified that he was subpoenaed to testify before a grand jury that was investigating Ashburne's murder, but he did not know the purpose of the grand jury investigation at the time. He also denied knowing any of the other witnesses who were present. He deleted text messages from his phone prior to testifying before the grand jury but claimed he did so to free up storage space on his phone, not to hide any evidence. He denied ever speaking with witnesses in Hightower's pending cases (JA1357-1399).

Alexander Pinchuk formerly was Matthew Hightower's neighbor. He knew that Hightower sold marijuana in the Park Heights area and sometimes purchased it from Hightower. He was a daily user and usually bought 3.5 grams, which cost between $40-$50, for his own personal use. After Hightower was incarcerated he purchased marijuana from Mosley for about a year. IX:203-209 He sometimes saw Mosley driving Hightower's silver Audi S6 a few times a week. Pinchuk acknowledged that he had seen individuals other than Mr. Mosley driving the Audi, including someone named "Wolf" (JA1393-1396).

Christopher Faber was employed by the Baltimore Firearms Analysis Unit. He testified as an expert in the field of firearms and tool mark examination.[5] After comparing his measurements of the lands and grooves of the bullet recovered from the body of Latrina Ashburne to the measurements in the general rifling characteristic (GRC) database, he concluded it had been fired from a Ruger semiautomatic firearm, model P90 or P95. On cross-examination he conceded that the GRC file is not exhaustive and does not contain information on every firearm.

Faber acknowledged that there is some variation in the manufacturing process of firearms, which can result in slight differences in land and groove measurements

---

[5] Tool mark identification involves examining tools like screwdrivers and wrenches for unique marks left during manufacturing (JA1402).

even among firearms of the same make and model. He also explained that a cartridge casing could be used to help identify the specific firearm from which a bullet had been fired, but acknowledged that he had not received a fired cartridge casing for examination (JA1405-1431).

On June 1, 2016, detectives from the Baltimore City Police Department homicide unit went looking for the Pontiac at Lawson's apartment building in Baltimore County. Carter left the building and got into a BMW SUV, later determined to be another one of Hightower's cars.

When stopped on June 1, 2016, Carter had three phones – an iPhone and two flip phones. There were very few contacts on the two flip phones, but one phone (the "7626 number") contained an entry for "Cliff" and the number 410-693-1533 (one of Mosley's two phones). Carter and Mosley communicated over the 7626 and 1533 numbers the night before and the morning of the murder. Carter registered the 7626 number on May 25, 2016 – two days before the murder. A second flip phone (the "5150 number") was the Sheldon Grant/ Matthew Hightower drug phone. Carter's third phone was an iPhone (443-293-2399). CSLI information did not place that phone anywhere near the murder scene (JA249-252, JA495-498, JA536-551).

Later on the afternoon of June 1, 2016, BPD homicide detectives interviewed Carter. After signing a *Miranda* waiver form, Carter admitted to being in possession

of the Pontiac on May 27, 2016, as he left Lawson's home that morning. Carter contended that he had dropped the Pontiac off to get new front brakes from a guy named "Tony" who worked on cars in the Park Heights area. Carter did not provide Tony's last name (JA538-539).

Carter did not say how the Pontiac was returned to his residence or why he was driving Hightower's BMW SUV (JA413). He said that Hightower was "like family" to him. Carter's phones contained information on two "Tony's," and neither had contact with Carter the night before or the morning of the murder. One "Tony" (Anthony Hart) was in South Carolina the morning of May 27; the other "Tony" (Antonio Vines) testified at trial that while he knew Carter, he was not a mechanic and did not install any brakes on Carter's Pontiac. Sgt. Sean Jones testified that he did not see evidence of recent brake repairs on the Pontiac (JA552, JA1998).

During his interview at BPD, Carter admitted that the marijuana found in the BMW belonged to him. The parties stipulated the amount was approximately 713 grams (approximately 1.572 pounds) (JA514). Other trial witnesses confirmed Carter sold marijuana in May 2016. Mosley had been selling marijuana for about a year and a half before the date of his statement (January 2017) and made approximately $150 a day doing that or other types of "hustling." Other witnesses also testified about marijuana possession and sales.

Deanna Lawson, the ex-girlfriend of Davon Carter, testified that she and Carter had dated for a few years and lived together for a while in a apartment prior to his incarceration. She suspected that Carter was seeing another woman and was concerned that he may have gone to see her before leaving for Myrtle Beach. She was angry that he had not returned her phone calls or texts. Lawson saw Carter driving a silver Audi belonging to Matthew Hightower. When shown a photo of a person related to the case, she declined to respond but asked to consult an attorney.

Although knowing Carter for 23 years and having lived with him for a while, Carter and Lawson were not entirely candid with each other, especially concerning his involvement with another woman. Lawson testified that she did not know that Carter was selling marijuana nor that he had been charged with a homicide. She was shown a surveillance video of a man running from the scene and felt pressured by homicide detectives to identify him (JA 297-381).

# SUMMARY OF ARGUMENT

1.    The District Court abused its discretion by declining to sever the homicide-related charges from the marijuana charges, to appellant's prejudice.

2.    The district court erred in refusing to suppress evidence obtained in violation of the defendants' Fourth Amendment right to be free of unreasonable searches and seizures.

3.    The Baltimore City Police lacked reasonable suspicion to conduct a *Terry* stop of Davon Carter, from whom it seized evidence that was used against appellant at trial.

4.    Baltimore City Police officers who stopped and detained Davon Carter in Baltimore County were acting outside their lawful jurisdiction.

5.    The district court erred in granting appellant's motion for judgment of acquittal since the evidence against appellant was insufficient as a matter of law to sustain his convictions.

# ARGUMENT

## I

## THE DISTRICT COURT ABUSED ITS DISCRETION BY DECLINING TO SEVER THE HOMICIDE-RELATED CHARGES FROM THE MARIJUANA CHARGES

### A.  Applicable Law

Joinder of defendants is governed by Federal Rule of Criminal Procedure 8(b).

The rule provides:

> The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count.

However, where defendants have been improperly joined, severance is mandatory. United States v. Santoni, 585 F.2d 667 (4th Cir. 1978).  *See also,* United States v. Whitehead, 539 F.2d 1023 (4th Cir. 1976), quoting King v. United States, 355 F.2d 700 (1st Cir. 1966) ("'any joinder which does not fall within [Rule 8(b)] is per se impermissible'").

## B.  Standard of Review

Questions of proper joinder under Rule 8 are matters of law, reviewable *de novo*.  Improper joinder will be reversed unless the error is harmless.  United States v. Werner, 620 F.2d 922 (2nd Cir. 1980).

Rulings as to severance under Rule 14, including the determination of risk of prejudice and any remedy that may be necessary, are left to the sound discretion of the district court, and are reviewed for abuse of discretion; United States v. Montgomery, 262 F.3d 233, 244 (4th Cir. 2000).

This Court reviews *de novo* whether charges are properly joined in an indictment.  United States v. Cardwell, 433 F.3d 378, 384–85 (4th Cir. 2005).  If the initial joinder was improper, this Court will "review this nonconstitutional error for harmlessness, and reverse *unless* the misjoinder resulted in no 'actual prejudice' to the defendant[ ] 'because it had [no] substantial and injurious effect or influence in determining the jury's verdict.'"  United States v. Mackins, 315 F.3d 399, 412 (4th Cir. 2003) (quoting United States v. Lane, 474 U.S. 438, 449 (1986)). If misjoinder is found, the Government must demonstrate that any resulting error was harmless. *See* United States v. Hawkins, 776 F.3d 200, 206 (4th Cir. 2015).

In Cardwell this Court summarized the governing standards for joinder under Fed. R. Crim. P. 8(a) and severance under Fed. R. Crim. P. 14(a).  For joinder, Rule

8(a) provides that "[t]he indictment ... may charge a defendant in separate counts with [two] or more offenses if [1] the offenses charged . . . are of the same or similar character . . . [2] are based on the same act or transaction, or [3] are connected with or constitute parts of a common scheme or plan. " We have interpreted the latter two prongs of this rule flexibly, requiring that the joined offenses have a "logical relationship" to one another. United States v. Hirschfeld, 964 F.2d 318, 323 (4th Cir. 1992). Such a relationship exists when consideration of discrete counts against the defendant paints an incomplete picture of the defendant's criminal enterprise. *See* 1A Charles Alan Wright, *Federal Practice and Procedure* § 143 (3d ed.1999) (noting that joinder is permitted where "the events pertaining to each [crime are] inextricably tied to the others").

## C. Argument

Before appellant Mosley was indicted, Carter moved to sever the charges related to the death of Ms. Ashburne from the very different charges involving distribution of marijuana, arguing both that the counts were improperly joined and, alternately, that the joinder was prejudicial. After Mosley was indicted, he moved to sever his case from that of codefendant Carter for trial (ECF-82). After a motions hearing, the district court denied the motion.

In denying the defense motion to sever the conspiracy and homicide charges from the drug charges, the district court ruled that "the government has sufficiently connected [the marijuana] counts to the more serious count such that they are part of a common scheme or plan . . . as the government theorizes that it does establish the interconnection between the different defendants, their relationships. . . . (JA47). It also found no prejudice because "the evidence related to the marijuana would probably be admissible" in the homicide case even without drug chargesand "I find it hard to believe that anyone will convict these defendants of the more serious crimes here based on evidence that they also were distributing marijuana, so I do not see the prejudice that the defendants are concerned about" (JA48).

The district court's ruling was inconsistent with this Court's decision in <u>United States v. Hawkins</u>, <u>supra</u>, 776 F.3d at 206. As in <u>Hawkins</u>, the indictment in the case at bar did not "allege an explicit connection" the homicide-related charges and the marijuana-related charges. 776 F.3d at 209. Indeed, at no time did the government allege *any* connection between marijuana trafficking and Ms. Ashburne's murder. The groups of counts are not of the "same or similar character." *Id.* As in <u>Hawkins</u>, the government's argument was not saved by the overlapping time frames of the two groups of charges, since this Court does "not believe that a mere temporal relationship

is sufficient to show that the two crimes at issue here were *logically* related." United States v. Cardwell, supra, 433 F.3d at 386 (footnote omitted).

The government's argument that Hightower and Carter were involved in both of sets of crimes similarly did not salvage the situation, because the government never alleged that the two conspiracies constituted a "common scheme or plan," as Rule 8(a) requires. *See* United States v. Oaks, 285 F.Supp.3d 876, 881 (D. Md. 2018) (severing obstruction of justice charge from public corruption charges because of misjoinder, as the "two schemes are quite distinct and far from 'common' as required by Rule 8(a)"). Finally, as in Hawkins, the misjoinder was not harmless. At a trial solely on the homicide-related charges, evidence that Carter sold marijuana would have lacked sufficient probative value to overcome its substantial unfair prejudice. For the same reasons, even if joinder were deemed to be proper, the district court abused its discretion by not granting a severance under Fed. R. Crim. P. 14(a).

## II

## THE DISTRICT COURT ERRED
## IN REFUSING TO SUPPRESS EVIDENCE
## OBTAINED IN VIOLATION OF
## THE DEFENDANTS' FOURTH AMENDMENT RIGHTS

### A.  Applicable Law

The Fourth Amendment prohibits unreasonable searches and seizures.  U.S.

Const, amend. IV.  Unless an exception applies, evidence seized in violation of the

Fourth Amendment must be suppressed under the exclusionary rule.  United States v.

Calandra, 414 U.S. 338, 347–48 (1974).

### B.  Standard of Review

This Court reviews *de novo* a properly preserved constitutional claim.  United

States v. Murillo, 826 F.3d 152, 156 (4th Cir. 2016), *cert. denied*, 137 S. Ct. 812

(2017).

### C.  Argument

The court below held hearings on the defendants' motions to suppress evidence

seized from Carter's cell phone location information (ECF-38) and to suppress

tangible evidence and statement (ECF-41) on Fourth Amendment grounds.[6]   The

---

[6]      Initially defendant Davon Carter (who was then the only defendant in the case) filed the above Motions to Suppress (ECF-38, ECF-41).  Once appellant Mosley had been joined as a codefendant, he joined as to the pending motions.

court made the following relevant findings of fact based on the testimony of four government witnesses (JA43-46).

> First there's the Motion to Suppress Evidence, particularly the tangible evidence being the cell phones and the bag of marijuana. The Defense argues that . . . the stop was unlawful, that they did not have an appropriate basis to make the stop and that effectively everything that flows from the stop is, therefore, fruits of an unlawful stop and seizure and should be suppressed.

> The Court disagrees with that argument for the following reasons: Mr. Carter, who fit a very rough description of the shooter, but more importantly -- and there's really not much there in terms of that description -- more importantly, he was seen entering the car that's in the video that was of interest to the murder prior to then getting into the BMW. I do find that that's sufficient to provide reasonable articulable suspicion for that original stop.

> Once the stop is made, the smell of weed, it's been testified to; there was an expert who testified to add on to it, but two officers testified that the smell of weed was strong and they recognized it immediately. And I do find that at that point, they had probable cause to search the vehicle.

> * * * * *

> . . . Finally, as to the Motion to Suppress Tangible Evidence as to the cell phones, the testimony -- there wasn't a lot of testimony about where the cell phones were recovered from, it was almost in passing, but Detective Forsythe did mention that the cell phones were taken from the defendant. At that point even though he had not been formally placed under arrest, there was probable cause for the arrest. So whether it was considered -- it could easily be considered a search incident to arrest at that point. Even if the arrest is not actually made, they certainly had probable cause to make an arrest at that point. So that takes care of the Motion to Suppress Tangible Evidence and Statements which is ECF No. 40.

### 1. Baltimore City Police Lacked Reasonable Suspicion to Conduct a _Terry_ Stop of the BMW

When the Baltimore City officers initially stopped the BMW Carter was driving in Baltimore County, they violated his Fourth Amendment rights in two distinct ways. First, they acted without the reasonable suspicion required for an action that amount to a 'seizure'" under the Fourth Amendment, even if only for a brief period and for a limited purpose. Whren v. United States, 517 U.S. 806, 809 (1996), that must be "justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." United States v. Cortez, 449 U.S. 411, 417 (1981). Moreover, they acted outside of their jurisdiction, in direct violation of Maryland law, and in violation of the Fourth Amendment.

An automobile stop is subject to the Fourth Amendment's reasonableness requirements. Whren, supra, at 810. Because a motor vehicle was stopped, even though it was stopped for a reason other than a traffic violation, the stop is appropriately characterized as a traffic stop. United States v. Gardner, 823 F.3d 793, 797-98 (4th Cir. 2016). Here, the district court found that the government met its burden of proving that reasonable suspicion justified a warrantless seizure, because Carter "fit a very rough description of the shooter" and "was seen entering the car that's in the video that was of interest to the murder prior to then getting into the BMW" (JA43-44). That conclusion was erroneous.

An officer may initiate a traffic stop on the basis of a reasonable suspicion that criminal activity is afoot, even in the absence of probable cause, but the stop must be supported with "articulable facts indicative of criminal misconduct." <u>Illinois v. Wardlow</u>, 528 U.S. 119, 123–24 (2000). Like a stop pursuant to <u>Terry v. Ohio</u>, 392 U.S. 1 (1968), such a stop must be brief and "justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." <u>United States v. Cortez</u>, <u>supra.</u> More precisely, police must have "a particularized and objective basis for suspecting the person stopped of criminal activity." <u>Ornelas v. United States</u>, 517 U.S. 690, 696 (1996).

Here, the decision to stop Carter was that of Baltimore City Police (BPD) Detective Forsythe. She had a search warrant for the vehicle as a result of it having been seen in the vicinity of the murder. The other BPD officers had no independent knowledge and merely carried out her instructions. Forsythe's justification for ordering the traffic stop was that she had seen Carter, a light-skinned African American – like the person on the video (as well as like tens of thousands of other men in the Baltimore area) walk out of the apartment building and enter the Pontiac before exiting and walking to the BMW (JA41-45).

This Court has held that the purpose of <u>Terry</u> is "to permit officers to take preventive action and conduct investigative stops *before* crimes are committed, based

on what they view as suspicious-albeit even legal-activity." <u>United States v. Perkins</u>, 363 F.3d 317, 326 (4th Cir. 2004). While probable cause "looks for past or present illegalities," reasonable suspicion "grant[s] officers the ability to prevent future wrongdoing." *Id.* at 327. The stop that Detective Forsythe ordered related to a *completed* felony, not ongoing or criminal activity. Pursuant to <u>United States v. Hensley</u>, 469 U.S. 221 (1985), law enforcement may conduct a <u>Terry</u> stop based on reasonable suspicion "that a person they encounter *was* involved in or is wanted in connection with a completed felony." *Id.* at 229 (emphasis added); *see also,* <u>United States v. Quarles</u>, 330 F.3d 650, 653 (4th Cir. 2003). On the other hand, <u>Terry</u> stops to investigate past crimes require heightened scrutiny.

> . . . A stop to investigate an already completed crime does not necessarily promote the interest of crime prevention as directly as a stop to investigate suspected ongoing criminal activity. Similarly, the exigent circumstances which require a police officer to step in before a crime is committed or completed are not necessarily as pressing long afterwards. Public safety may be less threatened by a suspect in a past crime who now appears to be going about his lawful business than it is by a suspect who is currently in the process of violating the law. Finally, officers making a stop to investigate past crimes may have a wider range of opportunity to choose the time and circumstances of the stop. . . .

<u>United States v. Hensley</u>, <u>supra</u>, 469 U.S. at 228-29.

The case at bar bears little resemblance to the facts of <u>Hensley</u> and <u>Quarles</u> and do not withstand heightened scrutiny. In <u>Hensley</u>, an informant told police the defendant had participated in a recent robbery. 469 U.S. at 223. The police issued a

wanted flyer to other police departments, which led to officers in another precinct stopping him 12 days after the reported robbery. The Supreme Court found this information sufficient to justify a <u>Terry</u> stop, stating:

> [W]here police have been unable to locate a person suspected of involvement in a past crime, the ability to briefly stop that person, ask questions, or check identification in the absence of probable cause promotes the strong government interest in solving crimes and bringing offenders to justice.

*Id*. at 229. <u>Terry</u> stops are not automatically permitted to investigate all past crimes, but are authorized when "police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a <u>Terry</u> stop may be made to investigate that suspicion." *Id.*

In <u>Quarles</u>, police received a call from an individual who was observing the defendant in real time and related (1) that the U.S. Attorney's Office was looking for the defendant; (2) a detailed description of the defendant, his clothing, his companions, and the fact that he was a carrying a bag with a gun; (3) information about the defendant's prior criminal conduct and court history; and (4) the identity of a Deputy U.S. Marshal who was looking for the defendant. 330 F.3d at 651-52. This Court affirmed the investigative stop under <u>Hensley</u> *(id*. at 656) because of the wealth of detail that the informant had provided.

Here, the government's evidence at the suppression hearing fell far short of this standard. BPD was not unable to locate Carter. The police knew exactly where he was staying, and set up surveillance of that location. Carter's opening the door to a car linked to a homicide, and remaining in the vehicle "not even seconds," does not add up to "reasonable suspicion, grounded in specific and articulable facts," that Carter was involved in a homicide. Based on Detective Forsythe's testimony, BPD would have claimed reasonable suspicion to stop and detain any light-skinned black male who entered the Pontiac for any length of time – a position that <u>Terry</u> and its progeny do not support.

In short, while <u>Florida v. Bostick,</u> 501 U.S. 429 (1991), permitted BPD to approach Carter and try to question him, on the record presented at the suppression hearing, the Fourth Amendment forbade the officers from seizing him.

Because of the Fourth Amendment violation, all evidence obtained as a result of the unlawful stop – cell phones, marijuana, and statements – should have been suppressed. If no exception to the warrant requirement applies to the facts of the case, "suppression of evidence obtained during illegal police conduct provides the usual remedy for Fourth Amendment violations," and courts should "suppress evidence that is the indirect product of the illegal police activity" as fruit of the poisonous tree.

United States v. Oscar-Torres, 507 F.3d 224, 227 (4th Cir. 2007); *see also,* Wong Sun v. United States, 371 U.S. 471, 488 (1963); Taylor v. Alabama, 457 U.S. 687 (1982).

The admission of evidence seized in violation of the defendants' Fourth Amendment rights severely prejudiced appellant's case, warranting reversal of his convictions.

### 2. Baltimore City Police Officers Who Stopped and Detained Carter Were Unlawfully Acting Outside of Their Jurisdiction

The BPD officers' execution of a Terry stop in Baltimore County was invalid for a second, entirely separate reason. The officers had no authority to initiate a Fourth Amendment seizure of Carter outside of their jurisdiction.

Baltimore City and Baltimore County are two different jurisdictional entities, and have separate police departments.[7] While BPD's jurisdiction is "unquestionably local," Alderman v. Baltimore City Police Department, 952 F. Supp. 256, 258 (D. Md. 1997) (citation omitted); *see also,* Johnson v. Baltimore Police Department, 452 F.Supp.3d 283 (D.Md. 2020). Md. Stat. Ann., Criminal Procedure § 2-102 provides that officers other than employees of the Maryland State Police may make arrests,

---

[7] Md. Code Ann., Local Govt, § 1-101(e).

37

conduct investigations, and otherwise enforce state law throughout the state only under specified circumstances.[8]

At the suppression hearing, the government offered no evidence that the BPD officers had satisfied any of the requirements of § 2-102(b)(3). While the district court found that there was no statutory violation because "the police officer was participating in a joint investigation with officials from officials from another state, federal or local law enforcement unit and that being the federal government, and the federal government certainly would have been able to make the arrest at that place" (JA71), none of the hearing evidence supported that conclusion. The only officers involved in stopping the BMW were from the BPD. No officers from any other state, federal, or local law enforcement unit were present. The government did not

---

[8]     Crim. Proc. § 2-102(b)(3) provides in relevant part:

A police officer may exercise the powers granted by this section when:

1.      the police officer is participating in a joint investigation with officials from another state, federal, or local law enforcement unit, at least one of which has local jurisdiction;

2.      the police officer is rendering assistance to another police officer;

3.      the police officer is acting at the request of a police officer or State Police officer; or

4.      an emergency exists; and

(ii)    the police officer is acting in accordance with regulations adopted by the police officer's employing unit to carry out this section.

demonstrate that at that time the BPD officers were participating in a joint investigation with any such unit. The government did not prove nor even contends that BPD was rendering assistance to another police officer or acting at the request of a state or local police officer. Nor was there any proof that an "emergency" existed[9] as the homicide under investigation had already occurred.

For these reasons, the evidence presented at the suppression hearing established unequivocally that the BPD officers unlawfully conducted a <u>Terry</u> stop – and later a full arrest – outside of their jurisdiction. The court below erred in refusing to suppress the fruits of the unlawful stop and arrest.

**III**

**THE EVIDENCE AGAINST APPELLANT
WAS INSUFFICIENT AS A MATTER OF LAW
TO SUSTAIN HIS CONVICTIONS**

**<u>A. Applicable Law</u>**

Reversal is warranted where a conviction cannot be said to be supported by "substantial evidence," meaning evidence "that a reasonable finder of fact could

---

[9] The Maryland statute defines "emergency" to mean "a sudden or unexpected happening or an unforeseen combination of circumstances that calls for immediate action to protect the health, safety, welfare, or property of a person from actual or threatened harm or from an unlawful act." Crim. Proc. § 2-101(b).

accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt," United States v. Young, 609 F.3d 348, 355 (4th Cir.2010).

## B.  Standard of Review

This court reviews *de novo* the district court's denial of a motion for judgment of acquittal.  United States v. Rodriguez-Soriano, 931 F.3d 281, 286 (4th Cir. 2019); United States v. Alerre, 430 F. 3d 681 (4th Cir. 2015).  In so doing, a court is obliged to sustain a guilty verdict if, viewing the evidence in the light most favorable to the government, it is supported by substantial evidence.  United States v. Burgos, 94 F. 3d 849 (4th Cir. 1996) (en banc) (citing Glasser v. United States, 315 U.S. 60 (1942)).

"Substantial evidence" is "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt. United States v. Green, 599 F.3d 360 (4th Cir. 2010). Appellant contends that, taking the evidence in a light most favorable to the government, a jury could not have reasonably concluded that he was guilty of the crimes charged, beyond a reasonable doubt.

In such a review, the issue is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Musacchio v. United States, 136 S. Ct. 709, 715 (2016) (internal quotation marks omitted). "A defendant

who brings a sufficiency challenge bears a heavy burden, as appellate reversal on grounds of insufficient evidence is confined to cases where the prosecution's failure is clear." <u>United States v. Clarke</u> , 842 F.3d 288, 297 (4th Cir. 2016); <u>United States v. Savage</u>, 885 F.3d 212, 219 (4th Cir. 2018).

## C.  Argument

In the instant case the government contended that Mosley had been waiting as the driver of the getaway car at the time of the Ashburne shooting, but presented no unequivocal proof in support of that claim.  Cell site location information introduced by the government[10] showed three telephone contacts between Carter and Mosley the night before the murder[11], and that cell phones registered to Carter and Mosley suggested they each left home the morning of the murder and headed to the Rosalind Avenue area.  Other cell site location information purportedly tracked the movements of the defendants' cell phones later that day, although there was no evidence that either individual was in possession of his cell phone at that time.

---

[10]     Appellant contends, *infra*, that the cell phone evidence was improperly admitted in violation of the Fourth Amendment.

[11]     During the same time period Mosley's girlfriend phoned him repeatedly but Mosley either did not answer the phone or did not have it in his possession.

The government did not charge Matthew Hightower with conspiring to order Ashburne's murder. Instead, the government charged two of Hightower's friends, Davon Carter and Clifton Mosley, in the case at bar.

The cell site location evidence failed to prove what the government claimed it showed – that the defendants were in present at the time and place of the homicide. Notwithstanding his expertise and experience, FBI Agent Wilde conceded that cell site analysis is not an exact science and that there are limitations and uncertainties involved in the analysis. His data did not allow him to identify the exact location of a phone, only the general area covered by a sector. Moreover, his data could not show whether a call was connected to a live person or just went to voice mail.

Despite those limitations, Wilde explained how he was able to use cell tower data and software to map the movements and communications of the cell phones associated with appellant Mosley and Davon Carter and their contacts including Kimberly Melvin and Deanna Lawson. His testimony indicated the patterns in the cell phone locations such as the proximity of the phones to the crime scene on May 27, 2016 and the movement of the phones from Baltimore after 12:30 p.m. and the overlap of the two phones' routes while en route to Myrtle Beach, South Carolina.

Agent Wilde's reports also showed the dates and times of text messages among the parties involved in the present case, which he used to create a timeline of events

and the locations of the individuals' phones from July 2015 to June 2016, including dates relevant to the case such as the dates of a grand jury appearance, a traffic violation and the date of the arrest.

On cross-examination Agent Wilde conceded that his analysis could not determine whether the individuals whose cell phones pinged the same towers were actually in the same place together, only that the data showed that the phones were near each other (JA773-779). Cellular phones connect to the tower with the strongest signal but not necessarily the nearest tower, depending on line of sight and landscape (JA820). Moreover, the data could not determine whether the individuals met in person as well (JA822). The flip phones used by the defendants were low quality so that the extraction may not have pulled all of the data (JA761).

That Mosley was in the vicinity of the shooting on the day of the offense was, in itself, inconsequential. This was an area that he knew well and frequented, not just around the time of the shooting. The government's evidence showed, at most, that on May 26, 2016 appellant Mosley was in the Park Heights neighborhood selling marijuana. Carter phoned him asking to switch cars, since Carter wanted to use the Audi to go to Myrtle Beach for the Memorial Day weekend. Mosley agreed, and drove back to Rosalind Avenue for that purpose.

The government's case against Mosley was grounded on his role as the alleged driver of the would-be getaway car. Although the government contended that Mosley was in the area in a Pontiac Grand Am waiting as the getaway driver after the shooting, the government failed to present any unequivocal evidence to that effect. No witness attested to seeing Mosley in the Pontiac. There was no fingerprint evidence or other forensic evidence, other than DNA that affirmatively excluded Mosley. In the absence of such evidence, the government asked the jury to speculate, based on the scraps of evidence it had presented, that Mosley had conspired with Carter to silence a witness against Hightower. There was no evidence that the parties' use of numerous cell phones, including "burner" phones, was significant other than to carry out the business of drug sales. The numerous jail calls that were offered in evidence provided no basis for the jury to find a conspiracy between Carter and Mosley. And, no less significantly, there was no evidence as to a motive that Carter, much less Mosley, may have had for murdering Latrina Ashburne or Lisa Edmonds. Matthew Hightower, who was suspected of offenses as to which Edmonds provided testimony, was but an acquaintance; neither Carter nor Mosley had any realistic reason to kill her.

Despite presenting the testimony of 39 witnesses and more than 300 exhibits consisting of documentary and electronic evidence, no witness was able to identify

Carter as the shooter.  No witness could identify Mosley as the would-be getaway driver.  No murder weapon was ever recovered.  No DNA or other forensic evidence linked either defendant to the shooting.  Edmonds' name was never mentioned in any of the recorded conversations that Hightower had with Carter and Mosley.  At the trial below, the government established that Carter and Mosley had committed offenses related to the sale of marijuana.  But it failed to prove beyond a reasonable doubt that they committed the charged offenses related to the murder of Latrina Ashburne.  United States v. Burgos, supra.

# CONCLUSION

For the foregoing reasons, appellant respectfully submits that appellant's convictions and sentence should be vacated. Since the evidence presented against appellant at trial was insufficient as a matter of law to sustain his convictions, this Court must enter an acquittal of all charges. <u>Burks v. United States</u>, 437 U.S. 1 (1978).[12]

Respectfully submitted.

/s/ Richard S. Stolker

_____

RICHARD S. STOLKER
Maryland Federal Bar No. 00259
12154 Darnestown Road, Unit 433
Gaithersburg, Maryland 20878
Telephone 301-294-9500
Email: rstolker@stolker.com

---

[12] Although this Court in <u>United States v. Block</u>, 590 F.2d 535, 543 (4th Cir. 1978) declined to direct an acquittal even in light of the <u>Burks</u> opinion, that was because in <u>Block</u> the lack of sufficient evidence coincided with the erroneous admission of some of the evidence at trial, so that the appropriate remedy was a reversal and remand, <u>Burks</u> notwithstanding.

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. _21-4541_     **Caption:** US v. MOSLEY

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

> **Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

> **Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

> **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

     [✓]   this brief or other document contains ___10,109___ [*state number of*] words

     [ ]   this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

     [✓]   this brief or other document has been prepared in a proportionally spaced typeface using
         Microsoft Word 2016 _____ [*identify word processing program*] in
         14 point Times New Roman _____ [*identify font size and type style*]; **or**

     [ ]   this brief or other document has been prepared in a monospaced typeface using
         _____ [*identify word processing program*] in
         _____ [*identify font size and type style*].

(s) _Richard S. Stolker_____

Party Name _appellant_____

Dated: _11/25/2024_____