No. 21-4541

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

### UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

### CLIFTON MOSLEY,

Defendant - Appellant.

*Appeal from the United States District Court for the*
*District of Maryland, Northern Division*
*The Honorable George J. Hazel, United States District Judge*

### RESPONSE BRIEF OF APPELLEE
### UNITED STATES OF AMERICA

Kelly O. Hayes
United States Attorney

Jason D. Medinger
Assistant United States Attorney
36 S. Charles Street, Fourth Floor
Baltimore, Maryland 21201
(410) 209-4800

March 20, 2025                    *Attorneys for the Appellee*

# TABLE OF CONTENTS

INTRODUCTION AND STATEMENT OF JURISDICTION ...............................1

STATEMENT OF THE ISSUES...........................................................................3

STATEMENT OF THE CASE.............................................................................4

SUMMARY OF ARGUMENT .............................................................................21

ARGUMENT .......................................................................................................23

I.     THE DISTRICT COURT PROPERLY EXERCISED ITS
DISCRETION IN DENYING MOSLEY'S REQUEST FOR
SEPARATE TRIALS ON HIS RELATED CHARGES...............................23

     A.     Standard Of Review ...........................................................23

     B.     Joinder Was Proper Under Fed. R. Crim. P. 8 ....................................24

     C.     The District Court Properly Exercised Its Discretion In Denying
Severance.............................................................................29

II.    THE DISTRICT COURT PROPERLY DENIED CARTER'S
SUPPRESSION MOTION ..........................................................................33

     A.     Standard Of Review ...........................................................34

     B.     Mosley Waived His Arguments Regarding The Evidence Recovered
From Carter .........................................................................34

     C.     Alternatively, Mosley Lacked Standing To Contest The Seizure And
Search Of Carter's Phone....................................................37

     D.     Alternatively, The District Court Properly Denied The Suppression
Motion .................................................................................39

i

E.    Alternatively, Any Evidence Admitted Against Mosley From Carter's Phones Was Harmless ..........................................................................46

III.   THE JURY'S VERDICT WAS SUPPORTED BY SUFFICIENT EVIDENCE ...................................................................................................48

A.    Standard Of Review ...........................................................................48

B.    The Jury Had More Than Enough Evidence To Convict Mosley ......49

CONCLUSION ........................................................................................................53

STATEMENT REGARDING ORAL ARGUMENT ...........................................54

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

*Alderman v. United States*, 394 U.S. 165 (1969) .....................................................38

*Clark v. Link*, 855 F.2d 156 (4th Cir. 1988) ........................................................44

*Fisher v. Washington Metro. Area Transit Auth.*, 690 F.2d 1133 (4th Cir. 1982) ..44

*Jackson v. Virginia*, 443 U.S. 307 (1979).................................................................49

*Kansas v. Glover*, 589 U.S. 376 (2020) .....................................................................42

*Miller v. State*, 824 A.2d 1017 (Md. App. 2003)......................................................45

*Minnesota v. Carter*, 525 U.S. 83 (1998) .................................................................38

*Rakas v. Illinois*, 439 U.S. 128 (1978)......................................................................37

*Robinson v. State*, 152 A.3d 661 (Md. 2017) ...........................................................42

*Snider Int'l Corp. v. Town of Forest Heights*, 739 F.3d 140 (4th Cir. 2014)..........44

*Street v. Surdyka*, 492 F.2d 368 (4th Cir. 1974) ......................................................43

*United States v. Adkins*, 100 F. App'x 159 (4th Cir. 2004).....................................41

*United States v. Akinkoye*, 185 F.3d 192 (4th Cir. 1999) ........................................29

*United States v. Beidler*, 110 F.3d 1064 (4th Cir. 1997) .........................................49

*United States v. Blauvelt*, 638 F.3d 281 (4th Cir. 2011)..........................................46

*United States v. Cannady*, 924 F.3d 94 (4th Cir. 2019)...........................................23

*United States v. Cardwell*, 433 F.3d 378 (4th Cir. 2005) ........................................24

*United States v. Castellanos*, 716 F.3d 828 (4th Cir. 2013) ....................................38

*United States v. Cole*, 857 F.2d 971 (4th Cir. 1988) ...............................................32

*United States v. Ervin*, 540 F.3d 623 (7th Cir. 2008) ..............................................30

*United States v. Eufrasio*, 935 F.2d 553 (3d Cir. 1991) ..........................................25

*United States v. Ford*, 88 F.3d 1350 (4th Cir. 1996) ...............................................29

*United States v. Godel*, 361 F.2d 21 (4th Cir. 1966) ...............................................25

*United States v. Gooch*, 665 F.3d 1318 (D.C. Cir. 2012) .........................................30

*United States v. Hackley*, 662 F.3d 671 (4th Cir. 2011) ...........................................30

*United States v. Hawkins*, 776 F.3d 200 (4th Cir. 2009) ................................... 27, 28

*United States v. Hensley*, 469 U.S. 221 (1985).........................................................40

*United States v. Humphries*, 372 F.3d 653 (4th Cir. 2004) .....................................42

*United States v. Hunt*, 99 F.4th 161 (4th Cir. 2024) .................................................49

*United States v. Lighty*, 616 F.3d 321 (4th Cir. 2010)............................... 29, 30, 33

*United States v. Lomax*, 293 F.3d 701 (4th Cir. 2002) .............................................49

*United States v. Mackins*, 315 F.3d 399 (4th Cir. 2003) ..........................................24

*United States v. Millender*, 970 F.3d 523 (4th Cir. 2020) ................................. 48, 49

*United States v. Mir*, 525 F.3d 351 (4th Cir. 2008) .................................................30

*United States v. Moore*, 769 F.3d 264 (4th Cir. 2014) .............................................35

*United States v. Mouzone*, 687 F.3d 207 (4th Cir. 2012) ........................................25

*United States v. Ojedokun*, 16 F.4th 1091 (4th Cir. 2021) ......................................34

*United States v. Padilla*, 508 U.S. 77 (1993)...........................................................38

*United States v. Perkins*, 363 F.3d 317 (4th Cir. 2004)...........................................34

*United States v. Quarles*, 330 F.3d 650 (4th Cir. 2003) ..........................................40

*United States v. Quinones*, 378 F. App'x 349 (4th Cir. 2010) ...............................25

*United States v. Reavis*, 48 F.3d 763 (4th Cir. 1995) ............................................29

*United States v. Salom*, 349 F. App'x 409 (11th Cir. 2009)...................................36

*United States v. Santiago-Francisco*, 819 F. App'x 157 (4th Cir. 2020)...............40

*United States v. Santoni*, 585 F.2d 667 (4th Cir. 1978)..........................................25

*United States v. Scheetz*, 293 F.3d 175 (4th Cir. 2002) ..........................................42

*United States v. Taylor*, 457 F. App'x 282 (4th Cir. 2011) ....................................35

*United States v. Taylor*, 857 F.2d 210 (4th Cir. 1988) ...........................................38

*United States v. Tipton*, 90 F.3d 861 (4th Cir. 1996)..............................................29

*United States v. Turnage*, 222 F. App'x 251 (4th Cir. 2007) .................................41

*United States v. Young*, 989 F.3d 253 (4th Cir. 2021).............................................29

*United States v. Weaver*, 282 F.3d 302 (4th Cir. 2002)...........................................47

*United States v. Williams*, 10 F.3d 1070 (4th Cir. 1993).........................................30

*United States v. Wilson*, 895 F.2d 168 (4th Cir. 1990)............................................35

*United States v. Wilson*, 115 F.3d 1185 (4th Cir. 1997)..........................................35

*Zafiro v. United States*, 506 U.S. 534 (1993) .........................................................31

## STATUTES AND RULES

U.S. CONST., amend IV ...........................................................................................37

18 U.S.C. § 1512(a)(1)(A) ........................................................................................19

18 U.S.C. § 1512(k) ...........................................................................................18

18 U.S.C. § 1513(a)(1)(B) .................................................................................18

18 U.S.C. § 1513(f) ............................................................................................18

18 U.S.C. § 3231 .................................................................................................2

21 U.S.C. § 841(a)(1)(A) ...................................................................................18

28 U.S.C. § 1291 .................................................................................................3

Fed. R. Crim. P. 8................................................................................... 23-26

Fed. R. Crim. P. 12(b)(3) ............................................................................22, 35

Fed. R. Crim. P. 14...................................................................................23, 29

Fed. R. Crim. P. 47(a) ....................................................................................36

Md. Criminal Procedure Code Ann. § 2-102 ..............................................43, 44

## INTRODUCTION AND STATEMENT OF JURISDICTION

On May 27, 2016, Latrina Ashburne was murdered outside of her home in Baltimore, Maryland.   JA 77-78; JA 115-117.   The shooter was Davon Carter.   JA 1959-1960; *see also* JA 2377; JA 584-585; JA 675; JA 401.   His accomplice and intended getaway driver was Clifton Mosley.   JA 1961-1962; *see also* JA 2063; JA 654-655; JA 2103.

Ms. Ashburne, however, was not the intended target.   *See* JA 466.   Carter and Mosley were attempting to kill Lisa Edmonds because she was a cooperating witness in a federal health care fraud case against Matthew Hightower, JA 466; JA 1031, who was their friend and drug-trafficking partner, JA 847; JA 1393. Edmonds happened to live next-door to Ashburne.   JA 460.   When Ashburne left her house that morning, Carter ran her down and shot her, mistakenly believing she was Edmonds.   JA 78; JA 466.

Law enforcement initially identified Carter and Mosley based on surveillance video that captured their vehicles in the area around the time of the murder.   JA 208-64; JA 2377.   Additionally, Edmonds alerted federal authorities and told them she thought the hit was intended for her based on her cooperation against Hightower. JA 466.   The police subsequently obtained Carter's and Mosley's cellphones.   JA

541; JA 1087.  The numbers for these phones matched those written down on a scrap of paper found in Hightower's jail cell under the names of "Davon" and "Cliff."  JA 547; JA 2447.  Cell-site location data placed Carter's and Mosley's phones at the scene at the time of the murder.  JA 653-685.  Call records indicated that Carter's and Mosley's phones communicated with each other 148 times during May 2016, JA 701, including several times on the morning of the murder, JA 654.  Two witnesses identified Carter as the shooter after seeing still photos from the surveillance video.  JA 401; JA 585.  There were also several recorded jail calls involving Hightower, Mosley, and Carter, including one just 11 days before the murder in which Mosley assured Hightower that he (Hightower) was going to "beat" his charges and that Mosley would do what needed to be done "on [his] end."  JA 2407.  Finally, the jury also heard evidence of marijuana trafficking involving both Hightower and Mosley.  JA 1393-1399.

Based on this and numerous other pieces of evidence, a jury convicted Mosley of, *inter alia*, conspiring to murder a witness and distribution of marijuana.  JA 1960-1961.  He was sentenced to life in prison.  JA 1973.  The district court had jurisdiction over this matter pursuant to 18 U.S.C. § 3231.  Following Mosley's

timely notice of appeal, JA 1978, this Court has jurisdiction over Mosley's appeal pursuant to 28 U.S.C. § 1291.

As detailed below, Mosley's claims are meritless. This Court should affirm.

## STATEMENT OF THE ISSUES

I.    Whether the district court properly exercised its discretion in denying Mosley's request for separate trials where the witness-murder charges were related to the drug-trafficking charge?

II.   Whether this Court should affirm the district court's denial of Carter's suppression motion because: (a) Mosley waived the arguments he raises here by failing to file his own motion to suppress below; (b) Mosley lacked standing to contest the search and seizure of the phone of his co-defendant, Davon Carter; and, alternatively, (c) the police officers had a reasonable suspicion to stop Carter and acted reasonably under the Fourth Amendment?

III.  Whether, construing all the evidence and inferences therefrom in the light most favorable to the government, the jury's verdict was supported by sufficient evidence?

## STATEMENT OF THE FACTS

### A.    Hightower Is Charged With Health Care Fraud

Matthew Hightower was a long-time friend of both Mosley and Carter. Kimberly Melvin, who was Mosley's girlfriend, testified that Hightower was "one of [Mosley's] best friends." JA 1153. Norman Powell, who was Mosley's cousin, testified that Mosley was Hightower's "home boy, right-hand man, [and] wing man." JA 1287. Alexander Pinchuk also referred to Mosley as Hightower's "right-hand man." JA 1393. Shayne Bird further confirmed that Mosley and Hightower were friends. JA 1306. There was also testimony that Carter was a "close" friend of Hightower. JA 330-331 (testimony of Deanna Lawson, who was Carter's girlfriend).

Hightower, Mosley, and Carter also sold marijuana together. Sheldon Grant testified that he was supplying Hightower with marijuana at a pace of five pounds every few weeks. JA 838-840. Hightower then introduced Grant to Carter, stating that Carter was Hightower's "boy." JA 843. Once Hightower was incarcerated, Carter contacted Grant and indicated that he (Carter) was "in charge now" of their drug-trafficking business. JA 847-848. There was also testimony from Carter's

downstream drug customers. JA 835 (Deshawn Walters testifying that he regularly purchased marijuana from Carter).

Similar testimony about marijuana trafficking was introduced as to Mosley. Kimberly Melvin, Mosley's girlfriend, testified that Mosley sold marijuana and that he received his supply from Hightower. JA 1156. Additionally, Alexander Pinchuk identified Mosley as Hightower's "right-hand man" and testified about how Hightower would send him to Mosley to buy marijuana. JA 1392-1393. Pinchuk also testified that when Hightower was incarcerated in May 2016, Mosley took over the marijuana-business for him, and that Pinchuk kept buying from Mosley from 2016 through 2017. JA 1393; JA 1399. Finally, Mosley himself admitted that he had been selling marijuana between approximately June 2015 and January 2017. JA 1103-1104.

On June 3, 2015, Hightower was indicted on charges of health care fraud. JA 2014. These charges stemmed from his work at RX Resources and Solutions ("RXRS"), a durable medical equipment company. JA 427-434. Hightower worked as a delivery driver for RXRS. JA 428. Lisa Edmonds worked there as well. *Id.* In 2013, it came to light that RXRS was billing customers for supplies that were never delivered. JA 431-432. Edmonds later reported her concerns to

the U.S. Department of Health and Human Services ("HHS").   JA 432-433; JA

2080-2082 (November 2013 report of interview between Edmonds and HHS Special

Agent Erin Fuchs).[1]   Based on this and other information, Hightower was indicted

for health care fraud along with his other RXRS co-workers, including Elma Myles,

and Harry Crawford.   JA 2014; JA 988-990.

   After the federal investigation against RXRS became overt, and after the

indictment was returned, rumors began to fly that Edmonds was an informant.   For

example, Belinda Turner testified that after search warrants were executed at RXRS

in February 2014, employees believed that Edmonds was behind it.   JA 1055-1056.

Turner shared her concerns that Edmonds was the source with Hightower.   JA

1056-1059.   Hightower responded that Edmonds was lying about him to the federal

agents.   JA 1058.   Turner and Hightower also speculated that Edmonds might have

---

[1] During this time, Edmonds also cooperated with local law enforcement about
Hightower's involvement in the murder of David Wutoh.   JA 2042-2043.
Edmonds reported how she overheard Hightower and another RXRS co-worker
(Harry Crawford) discuss the debt that Wutoh owed them, and how Hightower said
he would "burn him" if Wutoh did not pay.   *Id.*   Wutoh was found dead from a
gunshot wound in September 2013.   JA 2035.   Hightower was later convicted of
debt collection by extortion, in violation of 18 U.S.C. § 894, and use of a facility in
interstate commerce for extortion resulting in death, in violation of 18 U.S.C. §
1952(a)(2), (3), for his murder of Wutoh.   *United States v. Hightower*, 714 F. App'x
268 (4th Cir. 2018) (affirming convictions).

been recording them. JA 1070. Similarly, Elma Myles indicated that she spoke with Hightower and told him that she believed Edmonds had been providing information about their scheme and that Edmonds was the reason that a search warrant was executed at RXRS and that charges were brought. JA 995-999. She reported that Hightower concurred that Edmonds was the informant. JA 996. Finally, in a recorded jail call on March 15, 2014, Hightower told Carter that the investigation into RXRS was some "bullshit" and that "it probably all stem[med] from that lady [Edmonds]" who reported some "illegal shit goin' on." JA 2387.

Following his arrest on June 17, 2015, Hightower was granted pretrial release subject to certain restrictions. JA 2015. One of those conditions was that Hightower should not have any contact with any potential government witnesses. JA 2033. Nevertheless, on July 25, 2015, Hightower emailed Edmonds asking for her to call him to answer some questions he had about their time together at RXRS. JA 437; JA 2284. Then, in October 2015, Edmonds noticed a suspicious-looking BMW routinely sitting outside of her house at night. JA 2286.[2]

---

[2] Hightower drove a black BMW X5. JA 1483-1484; JA 2319.

**B.    Mosley And Carter Agree To Murder Edmonds For Hightower**

While he was on pretrial release, Hightower met and communicated regularly with Mosely and Carter.    For example, on December 9, 2015, Hightower texted his girlfriend, "I'm talking to Cliff right now."    JA 721.    There were other calls between Mosley's and Hightower's phones on January 6 and 7, 2016.    *Id.*    On February 1, 2016, Hightower texted his girlfriend, "Had Davon and Cliff and kid come through.    They all just left."    JA 723.    Hightower wrote another text to his girlfriend on March 20, 2016, in which he stated, "I had to get some things in motion."    JA 727.    He wrote another text later that day which stated, "I gotta see Cliff."    *Id.*

Then, on April 19, 2016, a federal grand jury returned a superseding indictment against Hightower, adding charges that he and Crawford extorted Wutoh and sent threatening communications to Wutoh in order to induce him to repay his debt.    JA 2017-2018.    This spurred the court to conduct a new detention hearing on May 6, 2016, which resulted in Hightower being detained.    JA 2020.    Additionally, at this point, Hightower's defense attorney (Richard Bardos) was re-sent a government witness no-contact list that included Edmonds' name.    JA 2051; JA

1680-1681. Bardos confirmed that he shared the list with Hightower on May 6, 2016. JA 1679.

Even though he was now incarcerated, Hightower remained in touch with Mosley and Carter. Specifically, on May 7, 2016, Hightower asked his girlfriend in a jail call to give him phone numbers for "C" and "Davon." JA 1528-1531; JA 2393. A later search of Hightower's cell revealed a scrap of paper containing phone numbers for Mosley and Carter under the names of "Cliff" and "Davon," respectively. JA 547; JA 2447. Hightower used these numbers to make several recorded calls from prison. *E.g.*, JA 2400-2402 (calls between Hightower and Carter on May 12, 13, and 15).

At this point, the level of activity and coordination between Mosley and Carter intensified. Specifically, as detailed above, they each took over part of the drug-trafficking operations in Hightower's absence. JA 847-848; JA 1393-1399. Additionally, they were more often in contact; their phones had 148 calls, text messages, and other communications in May 2016. JA 701; JA 2455; JA 2457; JA 2458.

They also had two in-person meetings, one on May 16 and another on May 17, 2016. On May 16, 2016, Carter traveled to Mosley's residence. JA 736 (text

message from Carter to Mosley that he is on the way); JA 831 (same). They later went to breakfast together at the IHOP, at which time they received a call from Hightower. JA 2406-2408. During this call, Mosley assured Hightower that he was going to "beat" his charges. JA 2407. He promised Hightower: "[E]verything going be good, yo . . . . You know what I mean? I'm gonna hold you down. You know what I mean? On my end." *Id.* As he was traveling that morning, Carter received a speeding ticket while driving a 2008 silver Audi which had a rear Maryland tag of 03591CG but was missing its front license plate and instead had a European-style tag. JA 827-829.[3]

Mosley and Carter had a second meeting on May 17, 2016, and this time they included Shayne Bird. JA 1300-1323. Bird knew Hightower from when they were incarcerated together. JA 1300. Bird had previously provided bail money to Hightower when he was previously charged with murder. JA 1303. Bird currently owned a towing company. JA 1300. During the meeting, Mosley and Carter asked

---

[3] Although the car was registered to Michael Fleming, it actually belonged to Hightower. JA 1624. Fleming testified that Hightower was the father of his niece, JA 1622, and that Fleming put the car in his own name as a favor to Hightower to get him better insurance rates. JA 1624. Then, once Hightower was incarcerated, Mosley took over the Audi and made the insurance payments on it. JA 1625. However, as detailed below, both Mosley and Carter were seen driving the Audi.

Bird whether he could tow one of Hightower's Audi's to Bird's shop at some point. JA 1326-1329. However, after the meeting, Bird did not feel comfortable dealing with Mosley and Carter anymore and so he never went ahead with the tow job. JA 1329.

At this point, Mosley and Carter were prepared to execute their plan. Carter even confided in his long-time friend Clarence Sampson that "somebody was telling on him [Hightower] and he [Carter] has to handle it." JA 1031. Accordingly, Carter obtained a new burner phone (443-386-7626) and activated it on May 25, 2016. JA 657-658. He then sent Mosley a text stating, "This Davo, lock me in." JA 694; JA 2273. Mosley added the 7626 number to the contacts in his phone (410-693-1533) that day. JA 694. For his part, late in the evening on May 26, 2016, Mosley woke up his girlfriend (Melvin) and asked her to teach him how to look up cases on the Maryland judiciary's website. JA 1176-1177. It is believed that he was checking on Edmonds's address through the state court case information that was available online. As it turns out, Edmonds was set to appear in state court on May 27, 2016, at 9:30am in an unrelated family law matter. JA 2336 (case information providing Edmonds's address); JA 2339 (setting May 27, 2016, hearing date). Her home address was fully visible through the online court records. *Id.*

Finally, Mosley and Carter had two brief calls with each other at 9:13pm and 10:04pm on May 26, 2016, which was the night before the murder.

## C. Mosley And Carter Mistakenly Murder Ashburne

On May 27, 2016, Mosley left his apartment (which was located at 4 Harness Court, Pikesville, Maryland) that morning some time before 6:15am. JA 1183-1184. His girlfriend indicated it was "unusual" for him to leave so early. JA 1184. He told her that he had to drop his daughter off at school. JA 1183.[4] Similarly, Carter left his apartment (which was located at 8480 Arbor Station Way, Parkville, Maryland) at approximately 6:00am. JA 301; JA 305; JA 308. His girlfriend thought he was leaving to drive down to South Carolina for "Bike Week." JA 311-312.

Shortly after Mosley and Carter left their residences, their respective girlfriends started calling and texting their phones to confirm where they were. However, neither Mosley nor Carter answered their calls or texts. JA 2179 (detailing unanswered calls and texts from 7:20am, 7:21am, 7:22am, 7:23am, 7:24am, 7:25am, 7:26am, and 7:27am from the phone of Mosley's girlfriend to

_____

[4] Mosley later admitted to Melvin that this was a lie; he said he did not have to drop off his daughter at school; rather, he said was out to "re-up" his drug supply. JA 1229-1230.

Mosley's phone); JA 2174 (detailing unanswered calls and texts from 6:03am, 6:06am, 6:08am, 6:11am, 6:19am, 6:20am, 6:23am, 6:25am, 6:26am, 7:03am, 7:17am, 8:19am, 8:41am, 8:44am from Carter's girlfriend to Carter's phone).

However, while they were ignoring their girlfriends' calls, Mosley and Carter were communicating with each other that morning:  Carter's burner phone (the 7626 number) called Mosley's phone (the 1533 number) at 6:13am and again at 6:15am.  JA 2458.

At approximately 7:00am, Aquana Murray, a neighbor of Ms. Ashburne, was standing outside of her house when she saw a man chasing Ms. Ashburne.  JA 78. The man then pulled out a gun and shot Ashburne.  *Id.*  She then saw the shooter run towards the alleyway.  JA 84.  Murray called 911 and reported the shooting. JA 2469-2471 (reporting the shooter was a black male, dressed in a hoodie and jeans).

The police arrived on the scene at approximately 7:20am.  JA 112.  The responding officer saw Ashburne lying face down in a pool of blood.  JA 115. Ashburne was later pronounced dead at the hospital.  JA 117.

 As police canvassed the area, they discovered that a nearby apartment complex had security cameras and obtained footage from that morning.  JA 197; JA

208. The footage showed the suspected shooter running from the scene. JA 249; JA 522; JA 2065-2068.[5] (Two witnesses, Deanna Lawson and Michael Bailey, later indicated that the shooter in the video footage looked like Carter. JA 401; JA 585.) The footage also showed two vehicles of interest: a Pontiac Grand Am and an Audi. JA 171; JA 251; JA 522. The footage showed the Audi driving down Rosalind Avenue and circling back using the surrounding streets at 6:16am, 6:19am, and 6:39am. JA 227-234; JA 251; JA 2056-2061; JA 2076. The footage shows the Pontiac in the same area at approximately 7:21am, and again at 7:28am. JA 239-242; JA 2062-2064; JA 2075; JA 2077-2078. Using the surveillance video, law enforcement was able to determine that the license plate of the Pontiac was Maryland registration 4BXC31. JA 523; JA 2062. That vehicle was registered to Antoinette King. JA 292. Her daughter is Deanna Lawson, who was Carter's girlfriend. JA 293; JA 297. Both King and Lawson confirmed that Carter at times drove the Pontiac. JA 294; JA 303-304.

---

[5] The shooter had an awkward gait in the surveillance footage. *Id.* The government introduced testimony that several months prior to this incident, Carter injured his back at work and required a brace, and that he was still experiencing pain around the time of the murder. JA 304; JA 2454 (texts from Carter regarding his work injury); JA 551 (stipulation that Carter was receiving medical care for pain from his fall as late as May 18, 2016).

Meanwhile, Lisa Edmonds was aware that her neighbor was murdered outside of her door, and so she called HHS Special Agent Fuchs. JA 462. Edmonds reported that she believed the shot was meant for her. JA 466. This caused law enforcement to investigate whether Hightower had any links to this murder. JA 521. Accordingly, law enforcement conducted a search of Hightower's jail cell, which produced a scrap of paper that had phone numbers for, *inter alia*, Carter and Mosley. JA 2422; JA 2447. Additionally, law enforcement pulled Hightower's jail calls, which showed him calling Carter's phone (443-293-2399)[6] and speaking with him multiple times in the days leading up to the murder. JA 2401-2420.

Armed with that information about Carter's potential involvement, law enforcement obtained a search warrant for the Pontiac. JA 495. Officers located the car on June 1, 2016, sitting outside Carter's residence, 8480 Arbor Station Way, Parkville, Maryland. *Id.* As officers were waiting to execute the warrant on the Pontiac, they observed a male (later determined to be Carter) exit the residence and get into a black BMW SUV. JA 498-500. Officers stopped the vehicle; smelled the strong odor of marijuana; and then placed Carter under arrest after he admitted

---

[6] Carter's probation officer confirmed that this was his phone number. JA 476.

to having marijuana in the car.   JA 501.   Large amounts of marijuana and cash were later recovered from a duffle bag in the BMW.   JA 502; JA 514.   Also found inside the BMW was a Maryland front license plate 03951CG which later was traced back to the Audi that was registered to Fleming, but which in fact belonged to Hightower and then later was used by both Carter and Mosley.   JA 546; JA 2006 (photo of license plate); JA 2322 (Audi registration documents); JA 827-29 (Carter driving the Audi on May 16, 2016); JA 1391 (testimony from Pinchuk that Mosley drove the Audi).

Carter was then transported to the Baltimore City Police department for questioning.   JA 512.   Meanwhile, the Pontiac was searched and $930 was recovered from the glove compartment.   JA 540-41.   Police ultimately recovered three cellphones from Carter that day: (1) the phone with the 2399 number; (2) a phone with the number of 443-761-5150; and (3) the burner phone with the 7626 number.   JA 541-543.

Ultimately, law enforcement found the Audi on August 10, 2016, in an automotive repair shop.   JA 544; JA 551.   It was missing the front license plate, and instead had a European-style plate on the front.   JA 544-546; JA 2006.

Then, on December 23, 2016, given his contacts to both Hightower and Carter, law enforcement interviewed Mosley.   JA 1084-1119.   Mosley voluntarily agreed to the interview, which took place at the Baltimore County Police Department.   JA 1086.   Mosley consented to law enforcement imaging his cell phones.   JA 1087. However, he stated that he had deleted all of his messages pertaining to Hightower. JA 1130.

Law enforcement then conducted cell-site analysis for the phones associated with Mosley and Carter.   Mosley was identified with two different phone numbers: (1) 410-693-1533; and (2) 443-704-2650.   JA 633; JA 650; JA 1165; JA 1237-1238; JA 2447.   Cell-site location data placed both the 1533 and the 2650 phones in the area of Rosalind Avenue on the morning of the murder.   JA 653; JA 2123; JA 2152-2155.   Similarly, Carter was associated with three phones:   (1) the 2399 number; (2) the 5150 number; and (3) the 7626 number.   JA 541-543; JA 632.   Cell-site location data showed the 7626 number travel from Carter's residence in Parkville, Maryland toward the area of Rosalind Avenue on the morning of the murder, and then proceed back to his apartment and then down to Myrtle Beach, South Carolina. JA 679-682; JA 2165-2172.   The data showed that the 2399 number was in a static position near Carter's apartment during the late morning, but later traveled down to

South Carolina, indicating that Carter returned home after the murder, picked up his cellphone, and then went to the beach. *See id.*[7]

## D.    Mosley And Carter Are Charged Federally

In 2017, Carter was charged with the murder of Ashburne.   JA 7; JA 1240. When Mosley's girlfriend learned of the news, she confronted him again to confirm whether he had anything to do with Ashburne's murder.   JA 1241.   She wanted to know if he was going to be charged too.   *Id.*   Mosley simply replied, "you just never know . . . it might not be over."   *Id.*

In fact, it was not over for Mosley.   On March 5, 2019, Mosley was charged in a superseding indictment with:

(1) conspiracy to murder a witness to retaliate against a person for providing information to law enforcement, in violation of 18 U.S.C. § 1513(f) (Count One);

(2) murder of a witness to retaliate against a person for providing information to law enforcement, in violation of 18 U.S.C. § 1513(a)(1)(B) (Count Two);

(3) conspiracy to murder a witness to tamper with an official proceeding, in violation of 18 U.S.C. § 1512(k) (Count Three);

---

[7] Lawson corroborated that the Pontiac was parked outside their home when she returned from work on the day of the murder, JA 421, indicating it was driven home and then Carter left for South Carolina.

(4) murder of a witness to tamper with an official proceeding, in violation of 18 U.S.C. § 1512(a)(1)(A) (Count Four); and

(5) distribution of marijuana, in violation of 21 U.S.C. § 841(a)(1)(A) (Count Ten).   JA 26-34.

Carter filed several pretrial motions, including a motion to suppress the evidence from the seizure of his cellphones.   JA 9 (ECF Nos. 38, 41).   The court held a hearing on the motion on March 14, 2019.   JA 11 (ECF No. 69).   Then, on July 13, 2019, Mosley filed a motion to sever, seeking a separate trial from Carter as well as a separate trial as between the witness-murder counts and the marijuana-distribution count.   JA 12 (ECF No. 82).

A follow-up motions hearing was conducted on August 9, 2019, at which time the district court denied Carter's motion to suppress.   JA 35-49.   The court noted that law enforcement had obtained a search warrant for the Pontiac, had observed the Pontiac in front of Carter's residence, and then observed Carter (who matched a rough description of Ashburne's shooter) exit his residence and go into the Pontiac before getting into Hightower's BMW and driving off.   JA 43-44.   The court held that this was enough to create a reasonable articulable suspicion to allow for a stop of the BMW.   *Id.*   And then once the police officers smelled the strong odor of

marijuana, there was probable cause to make an arrest of Carter, search the vehicle, and recover his cellphones.   JA 44-46.[8]

The court then also denied the defendants' severance motions, holding that the evidence of marijuana-trafficking would be admissible for the witness-murder charges, even if the court disallowed the joinder of the drug-trafficking charge.   JA 47-48.   And in any event, the court held that there was no prejudice because the marijuana charge was a "less serious charge" and hence would not unfairly sway the jury on the witness-murder charges.   JA 48.

Then, on September 17, 2019, Carter filed another motion to suppress.   JA 13 (ECF No. 91).   He argued in this motion that the Baltimore City Police Department officers who detained Carter and took him to the BPD headquarters did not have jurisdiction to place him in custody while he was in Baltimore County.   *Id.* The district court also denied this motion.   JA 70-71.   The court held that any state statutory concerns about the jurisdiction of the BPD officers did not impact Carter's constitutional rights.   *Id.*   Additionally, the court held that the officers were

---

[8] Mosley did not formally join Carter's motions to suppress prior to the court issuing its ruling.   JA 48.   And even then, Mosley only joined the motion to suppress cell-site information (ECF No. 38).   *Id.*

involved in a joint federal-state law enforcement investigation, and hence the cross-border activity was permissible even under Maryland law. *Id.*

The matter then proceeded to trial. JA 15 (ECF Nos. 129-136). After a 13-day trial, the jury returned unanimous guilty verdicts against both Mosley and Carter on all counts. JA 1959-1962.

Mosley was sentenced to life in prison as to the witness-murder counts (Counts One through Four) and 60 months concurrent on the marijuana distribution count (Count Ten). JA 1973. He filed a timely notice of appeal. JA 1978. As detailed below, this Court should affirm.

## SUMMARY OF ARGUMENT

Mosley and Carter were friends and business partners in the marijuana trade with Hightower. With Hightower facing federal charges, they agreed to murder the main witness against Hightower, his former co-workers Lisa Edmonds. In trying to murder Edmonds, however, they ended up killing Ashburne, Edmonds' next-door neighbor. While Mosley raises several arguments here on appeal, they are all meritless.

First, the district court properly rejected Mosley's severance motion. The witness-murder charges and the drug count were logically related to each other and

involved the same cast of characters and generally the same time periods. This was more than sufficient for the district court to exercise its discretion in denying the motion to sever.

Second, while Mosley complains about the cell-site information obtained from the police officers' stop of Carter, these claims fail for a variety of reasons. Mosley waived the argument by failing to file his own Rule 12(b)(3) motion to suppress. Moreover, even if not waived, Mosley lacked Fourth Amendment standing to contest the seizure of *Carter's* phones. Further, even if Mosley has standing, the claim still fails because the officers acted reasonably under the Fourth Amendment when they stopped Carter. And even if none of this were true, the alleged error resulting from the court's denial of Carter's suppression motion was harmless as to Mosley.

Third, there was more than sufficient evidence to sustain the jury's verdict against Mosley.

In all, Mosley has failed to demonstrate any defect in his prosecution. As such, his convictions should be affirmed.

# ARGUMENT

## I. THE DISTRICT COURT PROPERLY EXERCISED ITS DISCRETION IN DENYING MOSLEY'S REQUEST FOR SEPARATE TRIALS ON HIS RELATED CHARGES

While Mosley's first argument on appeal concerns the denial of his severance motion, the record here shows how the witness-murder charges were logically related to the marijuana-trafficking charge. Hence these defendants and counts were properly joined and the district court acted well within its discretion in trying Mosley with Carter and affording him one trial for his related charges.

### A. Standard of Review

This Court reviews "'*de novo* the district court's refusal to grant defendants' misjoinder motion to determine if the initial joinder of the offenses and defendants was proper under Fed. R. Crim. P. 8(a) and 8(b) respectively.'" *United States v. Cannady*, 924 F.3d 94, 102 (4th Cir. 2019) (citation omitted). If the initial joinder was proper, this Court then reviews "if the district court abused its discretion under Fed. R. Crim. P. 14 in denying pre-trial motions to sever." *Id.* If the initial joinder was not proper, however, this Court reviews this nonconstitutional error for harmlessness, and will reverse unless the misjoinder resulted in no actual prejudice

to the defendants because it had no substantial and injurious effect or influence in determining the jury's verdict.  *Id.*

In reviewing these motions, this Court may consider any evidence presented at the pretrial motions stage and at trial.  *See United States v. Cardwell*, 433 F.3d 378, 385 (4th Cir. 2005).

### B.     Joinder Was Proper Under Fed. R. Crim. P. 8(b)

The Federal Rules favor "'very broad joinder.'"  *United States v. Mackins*, 315 F.3d 399, 412 (4th Cir. 2003) (citation omitted).   An indictment may join two or more offenses if they "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan."  Fed. R. Crim. P. 8(a).   Similarly, an indictment may join two or more defendants if those defendants "are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses."  Fed. R. Crim. P. 8(b).   This Court has observed that "neither set of requirements is onerous."  *Mackins*, 315 F.3d at 412.

Although the rule does not define "same series of acts or transactions," this Court has held that the phrase "logically includes those transactions so interconnected in time, place and manner as to constitute a common scheme or plan."

*United States v. Santoni*, 585 F.2d 667, 673 (4th Cir. 1978); *see also United States v. Quinones*, 378 F. App'x 349, 351 (4th Cir. 2010) ("Joinder is proper where the offenses have a logical relationship with one another."). As such, where "codefendants are charged with separate substantive offenses, the substantive counts are not misjoined where the conspiracy count, the connecting link of the substantive counts, is proved." *United States v. Godel*, 361 F.2d 21, 24 (4th Cir. 1966); *see also United States v. Eufrasio*, 935 F.2d 553, 567 (3d Cir. 1991) (similar). Similarly, joinder is proper where, even though multiple crimes are alleged, the separate criminal activities support a common scheme or involve a similar cast of defendants. *See United States v. Mouzone*, 687 F.3d 207, 219 (4th Cir. 2012) (affirming joinder of RICO and drug distribution counts against a single defendant where "the government presented ample evidence showing that selling drugs was an activity in which [gang] members engaged to support the gang and rise in its ranks").

Here, the joinder of counts and defendants was proper. The evidence at trial amply demonstrated that Mosley and Carter were part of a drug-trafficking scheme with Hightower and that the murder was related to, and in furtherance of, their scheme. Grant was Hightower's source of supply, JA 838-840, and Hightower in turn served as a source of supply and customers for both Mosley and Carter, JA

1156; JA 1392-1393. Additionally, various witnesses who were drug customers of Hightower described Mosley and Carter as Hightower's "right-hand m[e]n." JA 1287; JA 1393; JA 843. Case in point, once Hightower was incarcerated, Carter and Mosley took over the drug-trafficking business for Hightower and kept up with his contacts and customers. JA 847-848; JA 1393; JA 1399. Further, when Carter was pulled over just days after the murder, he was in Hightower's BMW with a duffle bag full of marijuana and cash. JA 502; JA 514. Moreover, the Audi that was at the scene of the murder originally belonged to Hightower, but was later taken over and used by Mosley. JA 1624-1625. Plus, the evidence at trial demonstrated numerous contacts between and among Hightower, Mosley, and Carter in and around the time of the murder. JA 721-727; JA 2406-2408. All of these events (i.e. the Grant-Hightower-Mosley-Carter drug dealing scheme, the jail calls with Hightower, the switching of cars, the discovery of marijuana in the BMW) took place in the May-June 2016 timeframe, involved the same cast of characters, and involved interconnected activities. In this way, the witness-murder charges and the drug distribution charge were "interconnected in time, place and manner as to constitute a common scheme or plan." *Santoni*, 585 F.2d at 673. Moreover, the witness murder clearly furthered their common drug-dealing scheme. Hightower's federal

26

charges and potentially lengthy prison sentence served as an existential threat to their drug-trafficking business. Without Hightower, Mosley could have lost his source of supply of marijuana. To protect their business and help their co-conspirator and friend, Mosley and Carter agreed to murder the witness who was informing on Hightower. This provided an additional logical link between the witness murder charges and the marijuana trafficking charge. Hence, joinder was proper under Rule 8(a). *Mouzone*, 687 F.3d at 219.

Additionally, joinder of Mosley and Carter was proper because they acted in concert to effectuate the murder. Specifically, they met together on May 16 and 17 to plan the murder (JA 2406-2408; JA 1300-1323); they each performed preparatory work the day before the murder (JA 694; JA 2273; JA 1176-1177); they communicated with each other on the morning of the murder (JA 2458); their cars jointly cased the area looking for Edmonds that morning (JA 227-234; JA 251; JA 2056-2061; JA 2076; JA 239-242; JA 2062-2064; JA 2075; JA 2077-2078). On these facts, given the low bar in Rule 8(b), joinder of the two defendants was appropriate.

And nothing in Mosley's opening brief demonstrates otherwise. While he relies on *United States v. Hawkins*, 776 F.3d 200 (4th Cir. 2009), Op. Br. at 27-29,

that case is inapposite. In *Hawkins*, the defendant was charged with two unrelated crimes arising out of two distinct incidents: carjacking, arising out of the carjacking of a taxicab with a .357 caliber revolver; and felon-in-possession, arising out of an altercation at a convenience store, that took place over two weeks later and involved an entirely different handgun, a .9 millimeter pistol. *Id.* at 206-07. In holding that these charges were improperly joined, this Court noted that there was no evidence or even argument from the government that the charges were "based on the same act" or "constitute parts of a common scheme or plan." *Id.* It is different here. The government has demonstrated that the witness murder counts were based on the same acts and in furtherance of the defendants' common scheme and plan, that is, to ensure the well-being of Mosley's and Carter's drug-trafficking enterprise by helping their business partner and linchpin, Hightower, "beat" the charges against him. JA 2407 Indeed, as detailed above, the evidence of Mosley's drug trafficking was inextricably intertwined with the proof regarding the witness murder.[9] As such, *Hawkins* provides Mosley no help here.

--------------------------------

[9] While Mosley argues that the government did not allege any connection between the marijuana trafficking and the Ashburne murder, Op. Br. at 28-29, that is simply not true. The government argued the logical connections between the crimes and the evidence at the motions hearing, and the court credited the government's argument. JA 47 (holding that "the government has sufficiently connected those

## C. The District Court Properly Exercised Its Discretion In Denying Mosley's Severance Motion

Similarly, Mosley is wrong to claim that his charges should have been severed under Fed. R. Crim. P. 14. This rule gives the district court the discretion to sever counts or defendants if necessary to alleviate some showing of prejudice. *Id.* "Demonstrating prejudice is a high hurdle." *United States v. Young*, 989 F.3d 253, 266 (4th Cir. 2021).

This Court generally "adhere[s] to the principle that defendants indicted together should be tried together." *United States v. Lighty*, 616 F.3d 321, 348 (4th Cir. 2010). The presumption in favor of joint trials is particularly strong in cases charging multiple defendants with participating in a single conspiracy. *See, e.g.*, *United States v. Akinkoye*, 185 F.3d 192, 197 (4th Cir. 1999); *United States v. Tipton*, 90 F.3d 861, 883 (4th Cir. 1996); *United States v. Ford*, 88 F.3d 1350, 1361 (4th Cir. 1996). Thus, in order to persuade the trial court that severance was appropriate, Mosley had to "establish that actual prejudice would result from a joint trial . . . not merely that 'a separate trial would offer [] a better chance of acquittal.'" *United States v. Reavis*, 48 F.3d 763, 767 (4th Cir. 1995) (citation omitted); *see also United*

---

counts as to the more serious count such that they are part of a common plan or scheme").

*States v. Williams*, 10 F.3d 1070, 1080 (4th Cir. 1993) (burden is on the defendant to show that a joint trial "would be so unfairly prejudicial that a miscarriage of justice would result"). This Court and others have found that no prejudice inured from the joinder of homicide-related counts with other counts. *See, e.g.*, *United States v. Hackley*, 662 F.3d 671, 684-86 (4th Cir. 2011) (affirming joinder of murder-for-hire and drug charges with felon-in-possession charge); *United States v. Gooch*, 665 F.3d 1318, 1334-35 (D.C. Cir. 2012) (affirming joinder of murder charges with RICO and drug conspiracy charges); *United States v. Ervin*, 540 F.3d 623, 629-30 (7th Cir. 2008) (affirming joinder of murder in furtherance of criminal enterprise count with drug conspiracy count); *see also United States v. Mir*, 525 F.3d 351, 357-58 (4th Cir. 2008) (affirming joinder of non-fatal witness tampering charge with immigration fraud counts).

Here, the district court properly rejected Mosley's request for separate trials on these related charges. JA 47-48. Not only was he charged in the same indictment with Carter, but Mosley was alleged to have conspired jointly with Carter in Counts One through Four. JA 26-28. This alone demonstrates why severance should not have been granted. *Lighty*, 616 F.3d at 348; *Akinkoye*, 185 F.3d at 197. Further, the charges against Mosley involved overlapping evidence concerning

similar actors, similar time periods, and similar locations. Let's take Kimberly Melvin (Mosley's girlfriend) as an example. She testified that Mosley sold marijuana and that he received his supply from Hightower. JA 1156. She also testified that Mosley asked her to help him look up a case on Maryland judiciary case search the night before the murder, JA 1176-1177, and she testified about his whereabouts on the morning of the murder, 1183, and how he later admitted that he lied to her about where he was, JA 1229. If separate trials were ordered, Melvin would have to be called twice to provide essentially the same information in two different trials. As this example demonstrates, the district court acted well within its discretion because the joint trial "promote[d] efficiency and serve[ed] the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." *Zafiro v. United States*, 506 U.S. 534, 537 (1993) (internal quotation marks and citation omitted); *accord Mir*, 525 F.3d at 358 (severance should be denied where separate trials would require "duplicating witness testimony, impaneling additional jurors, and wasting limited judicial resources" on related charges).

Additionally, as the district court correctly found, Mosley failed to establish any prejudice from the joinder. JA 47-48. For starters, the marijuana charge was clearly the "less serious" charge. *Id*. Mosley can hardly claim that the jury might

have convicted him of the witness murder charge simply because he was also facing a marijuana charge. *Id.* Further, as the district court noted, there was significant overlap in the defendants and the offenses. *Id.* For example, the drug-trafficking conspiracy provided the link between Hightower, Mosley, and Carter, and provided a motive for the murder. Additionally, the evidence of the car stop involving Carter (during which time a duffle bag of marijuana and cash was found) was part of the investigative story behind how law enforcement obtained Carter's phones, which in turn led them to Mosley. In this way, contrary to Mosley's argument on appeal, Op. Br. at 29, the evidence of the marijuana trafficking would have been admissible in any trial on the witness-murder charges and vice versa. This further demonstrates why Mosley cannot establish any prejudice. *See United States v. Cole*, 857 F.2d 971, 974 (4th Cir. 1988) (holding that if "evidence of the joined crimes 'would be mutually admissible for legitimate purposes in separate trials for each offense,' the possibility of prejudice to the defendant from a joint trial 'is greatly diminished'") (citation omitted).

Finally, the district court provided express instructions that the jury was to consider each defendant and each count, individually, based on the evidence adduced as to that count. JA 1739-1740; JA 1758-1759. This Court has made

clear that jury instructions that the jury must view evidence against each defendant separately "eliminated the risk that the jury" would convict one defendant based on findings of guilty as to another defendant. *Lighty*, 616 F.3d at 351; *accord Tipton*, 90 F.3d at 893. This is because juries are presumed to follow the district court's instructions. *Id.* Further, here, the verdict sheet had individualized determinations for each defendant and for each count. JA 1959-1962. This was more than sufficient to eliminate any potential for prejudice.

For these reasons, the district court's denial of the severance motion should be affirmed.

## II. THE DISTRICT COURT PROPERLY DENIED CARTER'S SUPPRESSION MOTION

While Mosley's next argument on appeal concerns the district court's denial of Carter's motion to suppress evidence obtained by law enforcement on June 1, 2016, when they stopped Carter driving Hightower's BMW, Op. Br. at 30-39, these claims fail for several reasons. First, Mosley waived his right to challenge the items recovered from Carter by failing to move for suppression in his own right and by failing to join Carter's motion until after it was decided. Second, even if he preserved this issue, Mosley cannot claim protected Fourth Amendment rights in the evidence collected from Carter. Third, even if Mosley can demonstrate Fourth

Amendment standing in the search of Carter, he cannot demonstrate any error in the court's ruling. And fourth, even assuming any error, the denial of the motion was harmless. For any or all of these reasons, this Court should reject this argument and affirm.

### A.    Standard Of Review

"When considering on appeal a motion to suppress evidence, [this Court] review[s] a district court's factual findings for clear error and its legal determinations de novo." *United States v. Perkins*, 363 F.3d 317, 320 (4th Cir. 2004). Where the district court has denied the motion to suppress, all evidence must be construed in the light most favorable to the government. *Id.*

When a defendant has not preserved an objection below and raises suppression on appeal, this Court reviews only for plain error. *United States v. Ojedokun*, 16 F.4th 1091, 1113 & n.10 (4th Cir. 2021). To prevail on plain error review, Mosley must show (1) that the district court erred, (2) that the error was plain, and (3) that the error affected his substantial rights. *Id.*

### B.    Mosley Waived His Arguments Regarding The Evidence Recovered From Carter

While Mosley complains about the court's denial of Carter's suppression

motion, Op. Br. at 30-39, he fails to demonstrate how he preserved his ability to make these arguments. As detailed below, he waived them and they should not be considered here.

Federal Rule of Criminal Procedure 12(b)(3) provides that any suppression motion must be brought prior to trial or else it is waived on appeal. *See United States v. Moore*, 769 F.3d 264, 268-69 (4th Cir. 2014) (suppression argument made four days into trial before closing argument was waived); *United States v. Wilson*, 895 F.2d 168, 171-72 (4th Cir. 1990) (motion to suppress filed the day of trial deemed waived). This rule is claim-specific, meaning that the failure to raise a specific ground below means it is waived on appeal. *See United States v. Wilson*, 115 F.3d 1185, 1190 (4th Cir. 1997) (holding that defendant's pretrial challenge to validity of search warrant did not preserve on appeal challenge to execution of that warrant); *see also United States v. Taylor*, 457 F. App'x 282, 283-84 (4th Cir. 2011) (defendant waived ability to argue specific suppression ground on appeal because he did not raise that distinct argument below).

Here, Mosley did not file on his own a motion to suppress the evidence obtained from Carter prior to trial. *See generally* JA 7-15 (Docket). Nor did he file a boilerplate motion to adopt the motions of his codefendant. *Id.* Rather,

Carter filed his motion, JA 9 (ECF No. 38), which the court denied at a motions hearing on August 9, 2019, JA 46-47.  Only after the court denied motion did Mosley's counsel ask to join the motion to suppress Carter's cell-site location data. JA 48 (asking to join ECF No. 38).  This was too little too late.  *See United States v. Salom*, 349 F. App'x 409, 410 (11th Cir. 2009) (holding that defendant's attempt to join his codefendant's motion to suppress was untimely and hence his arguments were waived on appeal).[10]  And even then, Mosley only joined ECF No. 38, which was the motion for the suppression of Carter's cell-site data.  Mosley did not join ECF No. 41, which was Carter's motion that challenged the car stop.  After the seizure was made during the car stop, the government then obtained search warrants for the cell-site location data from Carter's phones.  In that way, to the extent Mosley is now attacking the denial of suppression of the cell-site data, his failure to challenge the initial car stop and seizure means his challenges are doubly waived.

In short, the rules required that Mosley do at least *something* to seek suppression.  Fed. R. Crim. P. 47(a).  This is for good reason.  Had Mosley filed a motion of his own or even made argument on Carter's motion, the government

---

[10] While Mosley avers that he joined Carter's motions after Mosley was indicted, Op. Br. at 30 n.6, he does not provide a citation for that averment and undersigned counsel is not aware of anything in the record which would so indicate.

could have responded and developed the record. Indeed, had he done so, the government would have pointed out his lack of standing, as detailed below. It cannot be that a defendant can simply join a motion after the district court has ruled, and thereby preserve full appellate rights. Rules 12(b)(3) and 47 are more demanding than that. Hence, this Court should consider the suppression arguments made here to have been waived.

### C. Mosley Lacked Standing To Contest The Seizure And Search Of Davon Carter's Phone

Alternatively, even if Mosley's belated suppression arguments are not waived, they are still meritless because he lacked any protected Fourth Amendment interest in Carter's possessions.

The Fourth Amendment provides that "[t]he right of the people to be secure in ***their*** persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST., amend IV (emphasis added). Given the inclusion of the term "their" in the amendment, the Supreme Court has held that "'Fourth Amendment rights are personal,'" and for that reason cannot be vicariously asserted. *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978) (citation omitted). It is not enough that Mosley was "'aggrieved . . . by the introduction of damaging

evidence.'" *United States v. Castellanos*, 716 F.3d 828, 833 (4th Cir. 2013) (quoting *Alderman v. United States*, 394 U.S. 165, 171-72 (1969)).

Rather, to assert the protection of the Fourth Amendment, Mosley had to demonstrate a legitimate expectation of privacy in the place the officers searched. *Id.* To demonstrate a legitimate expectation of privacy, the burden was on Mosley to show that he had a subjective expectation of privacy, and that the subjective expectation of privacy was objectively reasonable, or "an expectation that society is willing to recognize as reasonable." *Castellanos*, 716 F.3d at 832 (internal citation and quotation marks omitted); *accord Minnesota v. Carter*, 525 U.S. 83, 88 (1998).

Based on these general principles, courts have held that a defendant has no standing to challenge the admission of evidence illegally obtained from co-conspirators. *See United States v. Padilla*, 508 U.S. 77, 82 (1993) (holding that Padilla lacked standing to challenge the warrantless stop of Arciniega's vehicle, which led to the discovery of cocaine in the vehicle, even though they were co-conspirators in the drug trafficking scheme); *accord United States v. Taylor*, 857 F.2d 210, 214 (4th Cir. 1988) (co-defendants Collins and Thornton lacked standing to contest the allegedly unlawful pat-down of Taylor, who was a co-conspirator and a co-occupant of the car they were driving when it was stopped).

Here, law enforcement stopped Carter on June 1, 2016, as he was driving Hightower's BMW. JA 42-43; JA 495-501. Carter was alone in the car. *Id.* It was observed to be parked outside of Carter's house before it took off. *Id.* The car did not belong to Mosley; it was Hightower's. JA 1483-1484. Mosley did not claim he had been driving it; rather, Mosley was driving Hightower's Audi (which was registered to Fleming). JA 546; JA 2322; JA 827-29; JA 1391. On these facts, Mosley cannot establish any Fourth Amendment interest in the BMW, nor can he establish any interest in Carter's person. Because the search of the BMW and Carter ultimately yielded the phones which in turn led to the government's recovery of cell-site location data for Carter's phones, Mosley's lack of standing is fatal to his arguments here. And notably, Mosley fails to make any argument in his opening brief to justify his standing.

### D. Alternatively, The District Court Properly Denied The Suppression Motion

Even if Mosley's lack of standing is overlooked, his arguments still fail because the police conducted a proper car stop based on their reasonable suspicion that Carter fit the description of the person who murdered Ms. Ashburne.

It has long been established that the police may make an investigatory stop of the defendant based on reasonable suspicion to investigate a completed crime. In

*United States v. Hensley*, 469 U.S. 221 (1985), two armed men robbed a tavern and an informant indicated Hensley was the getaway driver. *Id.* at 223. Police issued a wanted poster for Hensley. *Id.* Hensley was later stopped while driving a car in a neighboring jurisdiction. *Id.* The Supreme Court upheld the stop, holding that "if police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion." *Id.* at 229. In reaching this decision, the Court noted that one particular interest served by this rule was to avoid enabling "the suspect to flee in the interim and to remain at large," particularly "in the context of felonies or crimes involving a threat to public safety." *Id.*

Pursuant to *Hensley*, this Court has repeatedly concluded that the police may stop vehicles containing individuals based on a reasonable suspicion that they were involved in serious crimes. *United States v. Quarles*, 330 F.3d 650, 652-53 (4th Cir. 2003) (affirming *Terry* stop where defendant matched the general description provided by a 911 caller and the defendant was wanted in connection with a completed felony); *see also United States v. Santiago-Francisco*, 819 F. App'x 157, 163 (4th Cir. 2020) (officers had reasonable suspicion to stop the car in which

defendant was a passenger based on information that defendant was present in the country unlawfully); *United States v. Turnage*, 222 F. App'x 251, 251 (4th Cir. 2007) (officers had reasonable suspicion to stop defendant who matched description given by a store clerk about a person who had been acting suspiciously); *United States v. Adkins*, 100 F. App'x 159, 160 (4th Cir. 2004) (anonymous tip that a person in a blue/gray van with a specific license plate was unlawfully shooting deer in the park provided sufficient reasonable suspicion to stop van matching that description).

Here, Carter was properly stopped pursuant to *Hensley* and its progeny.  At the time of the stop, officers had: (1) the description of the shooter from Murray's 911 call, JA 2469-2471 (reporting the shooter was a black male, dressed in a hoodie and jeans); (2) the surveillance video showing the man later determined to be Carter which corroborated Murray's description, JA 42; JA 2065-2068; (3) the surveillance video showing the Pontiac's license plate, JA 42; JA 2062; (4) the knowledge that the Pontiac came back to Mrs. King, JA 292, and that her daughter was Deanna Lawson who lived at 8480 Arbor Station Way, JA 293-297; (5) the knowledge that that Pontiac was sitting outside Arbor Station Way on June 1, 2016, JA 497-501; (6) the knowledge that they had a state court search for the Pontiac, JA 38; and (7) observations that a black male fitting the description and video surveillance of the

shooter exited the residence, went inside the Pontiac for a brief period, and then got into the BMW and drove off, JA 42-44. As the district court correctly found, this was more than enough to create a reasonable articulable suspicion to allow for a stop of the BMW. *Id.* There should be no question that the stop was permissible, particularly given the wealth of facts here and the low bar for establishing a reasonable suspicion. *See Kansas v. Glover*, 589 U.S. 376, 381 (2020) ("The reasonable suspicion inquiry 'falls considerably short' of 51% accuracy.") (citation omitted). And then once the police officers smelled the strong odor of marijuana, there was probable cause to make an arrest of Carter, search the vehicle, and recover his cellphones. JA 44-46; *see United States v. Humphries*, 372 F.3d 653, 658 (4th Cir. 2004) (holding that the odor of marijuana alone provided probable cause to search); *United States v. Scheetz*, 293 F.3d 175, 184 (4th Cir. 2002) (same); *see also Robinson v. State*, 152 A.3d 661, 680-81 (Md. 2017) (same). Given these facts and the law, the stop was proper.

And while Mosley tries to distinguish this case from *Hensley* and *Quarles*, Op. Br. at 34-35, his efforts fall flat. Indeed, the police issued precisely the kind of wanted poster for Mosley that was issued in *Hensley*. JA 2377. Moreover, the officers here had much more corroborative information pointing to Carter and the

Pontiac than was present in either *Hensley* or *Quarles*. The Pontiac was suspiciously at the scene of the murder and the person fitting the description of the shooter was observed going to the Pontiac and then getting into another vehicle. This stop was the classic kind of scenario that *Hensley* permits. After all, Carter had committed a particularly serious crime, and his entry into the BMW and driving off could have allowed him to flee and remain at large, which is precisely what *Hensley* provides should not happen. Officers had every right to stop Carter based on the reasonable suspicion they had. As such, the district court properly rejected Carter's motion.

Additionally, while Mosley claims the Baltimore City Police officers lacked the authority to make the stop in Baltimore County, Op. Br. at 37-39 (citing Md. Criminal Procedure Code Ann. § 2-102), he is mistaken twice over. As an initial matter, the Maryland state criminal procedure code does nothing to augment or diminish Mosley's or Carter's protections under the Fourth Amendment. The fact that the officers had reasonable suspicion as detailed above was sufficient for Fourth Amendment purposes. That should end the matter. Indeed, this Court so held in *Street v. Surdyka*, 492 F.2d 368 (4th Cir. 1974). In that case, Baltimore City police officers charged the plaintiff with a misdemeanor offense even though the offense

was not committed in the officer's presence, which was a violation of Maryland criminal procedure. This Court rejected the plaintiff's constitutional claim, holding that while "states are free to impose greater restrictions on arrests [over and above the Fourth Amendment's protections], [] their citizens do not thereby acquire a greater federal right." *Id.* at 372. This holding has been applied in several different contexts where this Court has rejected plaintiffs' attempts to transmogrify violations of state criminal procedure into Fourth Amendment claims. *Snider Int'l Corp. v. Town of Forest Heights*, 739 F.3d 140, 145 (4th Cir. 2014) (citing *Street* and holding that "[e]ven if the citations violated Maryland law, the noncompliance would not violate federal law and thus cannot give rise to § 1983 relief"); *Clark v. Link*, 855 F.2d 156, 163 (4th Cir. 1988) (violations of North Carolina criminal procedural law not sufficient to impact Fourth Amendment); *Fisher v. Wash. Metro. Area Transit Auth.*, 690 F.2d 1133, 1138 (4th Cir. 1982) (holding that where a state law requirement is more stringent than the Fourth Amendment, "such a requirement of state law cannot therefore be held to affect the general constitutional standard"); *accord United States v. Laville*, 480 F.3d 187, 192 (3d Cir. 2007) ("[T]he validity of an arrest under state law must never be confused or conflated with the Fourth Amendment concept of reasonableness."); *United States v. Green*, 178 F.3d 1099,

1105 (10th Cir. 1999) ("'[T]he fact that the arrest, search, or seizure may have violated state law is irrelevant as long as the standards developed under the Federal Constitution were not offended.'") (citation omitted).   In this way, while Mosley's citation to Md. Criminal Procedure Code Ann. § 2-102 might have mattered if he were charged in state court, it had no bearing on the district court's Fourth Amendment ruling here.

Additionally, Mosley is in error to claim that there was any violation of Md. Criminal Procedure Code Ann. § 2-102 at all.   An officer may engage cross-jurisdictional police powers when "the police officer is participating in a joint investigation with officials from another state, federal, or local law enforcement unit, at least one of which has local jurisdiction" or if an "emergency" exists.   Md. Crim. Proc. Code Ann. § 2-102(b)(3).   Here, as the district court found, the government demonstrated that the officers were acting as part of a joint federal-state investigation.   JA 71.   Further, Maryland courts have held that the emergency exception applies when a criminal suspect is in a vehicle and may pose a risk of committing another crime.   *Miller v. State*, 824 A.2d 1017, 1022-23 (Md. App. 2003) (emergency exception applies where defendant and defendant's car matched the description given by a victim who had been raped less than two hours earlier and

a female in the car may have been in danger).   Given that Ashburne had been

murdered just four days prior to Carter's arrest, and the officers saw Carter getting

into a car and potentially fleeing or being able to commit more crimes, the

emergency exception was triggered allowing the officers to cross jurisdictional

bounds to effectuate an arrest.   Moreover, it should be noted that immediately upon

making the stop and curbing the emergency, the officers contacted Baltimore County

police to effectuate an arrest for the marijuana.   Accordingly, as the district court

found, there was no violation of Maryland state criminal procedure here.   This

further buttresses the validity of the stop.   And because the stop was proper, this

Court should affirm.

### E.      Alternatively, Any Evidence Admitted Against Mosley From Carter's Phones Was Harmless

Even if there was any error with regard to the evidence obtained from the stop

of Carter on June 1, 2016, in light of the overwhelming evidence supporting

Mosley's convictions, any error was harmless.

The district court's refusal to suppress evidence is subject to harmless error

review.   *See United States v. Blauvelt*, 638 F.3d 281, 290-91 (4th Cir. 2011)

(applying harmless analysis to the district court's refusal to exclude incriminating

statements).   The improper admission of evidence "will be found harmless if [the

46

Court is] able to conclude, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *United States v. Weaver*, 282 F.3d 302, 314 (4th Cir. 2002) (internal quotations and citation omitted).

Here, there was overwhelming evidence of Mosley's guilt without the fruits of Carter's arrest, and hence any error as to the admission of such evidence is harmless. Shortly after the fatal shots were fired that killed Ms. Ashburne, Edmonds reached out to SA Fuchs at HHS and indicated that she believed the hit was meant for her. JA 466. This in turn led law enforcement to investigate Hightower's potential involvement. JA 521. Law enforcement conducted a search of Hightower's jail cell, which produced a scrap of paper that had phone numbers for, *inter alia*, Carter and Mosley. JA 2422; JA 2447. Additionally, law enforcement pulled Hightower's jail calls, which showed him calling Carter's phone (443-293-2399) and speaking with him multiple times in the days leading up to the murder. JA 2401-2420. Hightower's jail calls with Carter also featured Mosley. JA 2406-2408. And when he was interviewed, Mosley himself consented to law enforcement accessing his phone. JA 1086-1087. In this way, even without the evidence from the June 1, 2016, stop, the evidence introduced as to Mosley as to the

witness-murder charge would still have been developed and presented at trial. Furthermore, as to the marijuana charge, numerous witnesses testified that Mosley was a marijuana dealer. JA 1156; JA 1392-1399. Indeed, Mosley himself admitted that he had been selling marijuana between approximately June 2015 and January 2017, and this admission was part of the proof against him. JA 1103-1104. All of this evidence had nothing to do with the evidence seized from Carter on June 1, 2016. As such, there is no way Mosley can claim that the admission of the evidence seized from Carter substantially swayed the jury as to Mosley's charges. As such, any error must be deemed harmless and hence this Court should affirm.

## III. THE JURY'S VERDICT WAS SUPPORTED BY SUFFICIENT EVIDENCE

While Mosley's final argument on appeal concerns the sufficiency of the evidence, Op. Br. at 40-46, this argument is also meritless. More than ample evidence demonstrated Mosley's guilt. That is why the jury swiftly returned guilty verdicts on all counts. This Court should affirm.

### A. Standard Of Review

The Fourth Circuit reviews de novo the denial of a Rule 29 motion for judgment of acquittal after a jury verdict. *United States v. Millender*, 970 F.3d 523, 528 (4th Cir. 2020). When reviewing the sufficiency of the evidence after a

conviction, every presumption in favor of a jury verdict must be indulged. *United States v. Hunt*, 99 F.4th 161, 184 (4th Cir. 2024). If there is any discrepant testimony, this Court must presume the jury construed the evidence in favor of the government. *Id.* All reasonable inferences from the evidence must be drawn in the light most favorable to the government. *Id.*; *United States v. Lomax*, 293 F.3d 701, 705 (4th Cir. 2002). In considering such a challenge, the court asks "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Millender*, 970 F.3d at 528 (emphasis in original) (quoting *Jackson v. Virginia*, 443 U.S. 307 (1979)). A defendant challenging the sufficiency of the evidence bears a heavy burden. *United States v. Beidler*, 110 F.3d 1064, 1067 (4th Cir. 1997).

### B. The Jury Had More Than Enough Evidence To Convict Mosley

The government produced more than sufficient evidence here. As detailed above, the government established the links between Hightower, Mosley, and Carter, demonstrating they were friends and drug-trafficking partners. JA 1153; JA 1287; JA 1156; JA 1392-1399. The government also demonstrated how Hightower blamed Edmonds for the health care fraud charges against him. JA 1056-1059; JA

2387. Further, Hightower knew Edmonds was a key witness against him. JA 2051; JA 1680-1681. Accordingly, as Hightower noted to his girlfriend, he had to "get some things in motion," JA 727, which meant calling "Cliff" and Carter and soliciting their help to murder Edmonds. *Id.* The government introduced evidence of the preparatory calls between Hightower, Carter, and Mosley while Hightower was incarcerated. JA 2400-2402 (calls between Hightower and Carter on May 12, 13, 15, and 16). Further, the evidence demonstrated the increased level of activity between Mosley and Carter in May 2016, JA 701, along with their in-person meetings on May 16 and 17, 2016. JA 2406-2408; JA 1300-1323. Indeed, it was here that Mosley assured Hightower that he was going to "beat" his charges and that he was going to hold things down on his end. JA 2407. The government even had a witness confirm the plan: Clarence Sampson testified that Carter told him that "somebody has been telling on him [Hightower] and he [Carter] has to handle it." JA 1031. Finally, the government meticulously presented evidence about the immediate events surrounding the murder, including:

(1) Carter's activation of a new burner found and his texts to Mosley on May 25, 2016, JA 657-658;

(2) Mosley's efforts to look up Edmonds on the Maryland judiciary case search website on May 26, 2016, JA 1176-1177;

(3) Mosley and Carter's two brief calls with each other at 9:13pm and 10:04pm on May 26, 2016, JA 2458;

(4) Mosley and Carter's calls with each other at 6:13am and 6:15am on May 27, 2017, JA 2458, while they were both ignoring multiple calls from their girlfriends, JA 2179;

(5) the surveillance video which featured the shooter and the Pontiac and Audi vehicles driven by Mosley and Carter, JA 171; JA 249; JA 522; JA 2065-2068; and

(6) the historical cell-site data that showed Mosley's and Carter's phones in the area at the time of the murder, JA 653; JA 2123; JA 2152-2155.

If this were not enough, the government adduced additional evidence of guilty knowledge and after-the-fact attempts to cover up criminality. Specifically, Mosley admitted he lied to his girlfriend about his whereabouts that morning, JA 1229, and he admitted to deleting his communications with Hightower from his phone, JA 1130. Further, in what came close to an admission, Mosley admitted to his girlfriend after Carter was charged that it "might not be over" for him, JA 1241. Finally, in addition to this evidence about the witness murder, Mosley also admitted

to being a marijuana dealer during the charged time period. JA 1103-1104. And there was ample evidence of his marijuana dealing from other witnesses.

In this way, there was overwhelming evidence against Mosley here. He cannot sustain his heavy burden to deny the sufficiency of the evidence. As such, this Court should affirm.

And again, nothing in the opening brief demonstrates otherwise. Mosley mainly re-argues his closing argument in an attempt to demonstrate there was some reasonable doubt. Op. Br. at 44. However, he forgets the standard of review that applies here. We must presume that the jury resolved all doubts in favor of the government. For example, while he avers that no witness was able to identify Carter as the shooter, that is not accurate. Two witnesses said the figure in the surveillance video looked like Carter, and the jury had the video for itself to view. We must presume the jury concluded that Carter in fact the shooter based on all the evidence. Similarly, while Mosley avers that no one testified that Mosley was driving the Pontiac on the day of the murder, we have plenty of evidence that Mosley did drive the Pontiac on other occasions, and we have ample evidence that these defendants routinely shared cars. Further, we have the evidence placing Mosley at the scene based on his cell-site data. And we have his pre-murder jail calls and his

post-murder statements implicating his guilty knowledge.   Given the standard that must be applied here, this is more than sufficient for a rational jury to have found Mosley guilty as charged.   This Court should affirm.

## CONCLUSION

Based on the foregoing, the government respectfully requests that this Court affirm Mosley's convictions.

Respectfully submitted,

Kelly O. Hayes
United States Attorney

_____/s/_____
Jason D. Medinger
Assistant United States Attorney

## STATEMENT WITH RESPECT TO ORAL ARGUMENT

The United States respectfully suggests that oral argument is not necessary in this case.

# CERTIFICATE OF COMPLIANCE

1.      This brief has been prepared using:

       **Microsoft Word, Times New Roman, 14 Point**

2.      EXCLUSIVE of the corporate disclosure statement; table of contents; table

of citations; statement with respect to oral argument; any addendum

containing statutes, rules, or regulations, and the certificate of service, the

brief contains 11,391 words.

I understand that a material misrepresentation can result in the Court's

striking the brief and imposing sanctions. If the Court so directs, I will provide an

electronic version of the brief and/or a copy of the word or line print-out.

                                    _____/s/_____

                                    Jason D. Medinger
                                    Assistant United States Attorney

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 20th day of March 2025, I electronically

filed the foregoing with the Clerk of Court using the CM/ECF System, which will

send notice of such filing to the following registered CM/ECF users:

Richard S. Stolker
Law Offices of Richard S. Stolker
12154 Darnestown Road, Suite 433
Gaithersburg, Maryland 20878

_____/s/_____
Jason D. Medinger
Assistant United States Attorney